I JOHNSON, Justice.
We granted this writ of certiorari to determine whether the court of appeal erred in reversing the trial court’s order terminating the parental rights of S.M., the mother of three minor children, J.M., J.P.M., and M.M. After a review of the record and the applicable law, we reverse the judgment of the court of appeal and reinstate the judgment of the trial court, terminating S.M.’s parental rights.
FACTS AND PROCEDURAL HISTORY
On June 16,1997, the State of Louisiana, Department of Social Services (“DSS”) received a complaint, alleging that F.M.’s and D.M.’s legal guardian, their paternal grandfather, had “whipped” F.M. and left bruises on him. It was also reported that “Mary,” the grandfather’s companion, had “sexually enticed” D.M. by “walking around with no clothes on and rubbing raw meat on her private parts and making [D.M.] eat the meat.” A subsequent investigation revealed that Mary had beaten the boys with a belt, leaving marks on F.M. The children were placed in the custody of their mother, S.M., pending an additional investigation.[1] S.M. had three Rother mi *1249 nor children, J.M., J.P.M., and M.M. At that time, S.M. and the three younger children were living in a shelter, as she had no suitable housing for her family. The children’s father, F.H. was employed and was attempting to locate housing for the family.
At a hearing held on August 26, 1997, DSS recommended transferring custody of F.M. and D.M. to their mother and requested court ordered supervision of the family. Nevertheless, the judge adjudicated all five of the children “in need of care.” The two older children, F.M., who was nine years old, and D.M., who was seven years old, were placed into the custody of DSS. However, J.M., J.P.M., and M.M., who were ages five, three, and two, were left in their mother’s custody under DSS supervision.
DSS continued to work with the family in an attempt to reunite all of the children with their mother. S.M. eventually left the shelter and moved in with “Ms. L.” Meanwhile, she continued to attempt to secure adequate housing for her family.
IsDuring this period, DSS discovered that J.M., who was five years old, had not been enrolled in kindergarten, and the other two children, ages three and two, had not begun to speak. S.M. had missed several appointments with the School Board. Although DSS made new appointments and provided transportation, S.M. was frequently not ready when the transportation arrived. Eventually, with DSS’s assistance, J.M. was enrolled in school, and the two younger children were evaluated by Iberia Parish School Board. Subsequently, J.P.M. was accepted into a Pre-K enrichment program, and M.M. was accepted by the Infani/Toddler Program.
Meanwhile, the DSS case worker assigned to the family noted that S.M. demonstrated difficulty in caring for the three children. The notes reveal that S.M. had failed to obtain suitable housing for her family, as she and the children continued to reside in the home with Ms. L. The case worker reported that “there were always a number of individuals in the home,” and she was “not certain who resided in the home with [S.M.].”[2] She also reported that during her visits with the family, she observed that the three children were sleeping on a mattress on the living room floor of the home, while S.M. slept on the sofa and that the children were “always just in diapers, usually dirty.”
A review hearing was held on March 23, 1998. The trial judge amended the previous adjudication order, ordering that J.M., J.P.M., and M.M. be taken into the custody of the State and placed in a foster home.
*1250 In April 1998, S.M. gave birth to a sixth child, T.M. By this time, S.M. had moved out of Ms. L.’s home. However, she and the baby had moved into “another home with a number of people residing in it.” According to agency notes, S.M. and the baby resided in one of the bedrooms of the house, along with the children’s father, |4F.H., who resided there “at times.”
In early August 1998, DSS lost contact with the family, and S.M. did not contact the agency to inform it of her whereabouts. DSS later learned that F.H., the children’s father, had purchased a two-bedroom trailer for his family. Thereafter, DSS recommended the return of the two oldest children, F.M. and D.M., to their parents’ custody, and on March 22, 1999, the trial court ordered the return of custody of the two children to their parents. However, J.M., J.P.M., and M.M. remained in the State’s custody, and S.M. visited with them every two weeks at the DSS office.
At some point, DSS expressed concern that if custody of J.M., J.P.M., and M.M. were returned to their parents, the two-bedroom trailer would be overcrowded and unsuitable housing for all six children. DSS suggested that F.H. add on to the trailer. After F.H. expressed that he had used the money that he had saved to add on to the trailer for other purposes, DSS sought to provide him with the funds. DSS later determined that before it would provide the funds to add on to the trailer, S.M. needed to undergo a psychological evaluation to ascertain whether the return of the children was realistic. On June 3, 1998, S.M. was evaluated by Dr. Henry Lagarde, who testified that she manifested an intellectual capacity in the upper range of mild mental retardation.
DSS continued to evaluate the family in the hopes of reuniting J.M., J.P.M., and M.M. The bi-weekly visits with S.M. and the three children continued. In November 1999, DSS planned an in-home visit with S.M, J.M, J.P.M, and M.M. S.M. had been instructed to prepare lunch and plan activities for the children. When DSS arrived with the children, lunch had not been prepared, and no activities had been planned. The children entertained themselves by going in and out of the house and listening to music. At one point during the visit, J.P.M. became missing. He was later located on the side of the trailer, near a canal. The DSS worker also noted that S.M. |Rexhibited difficulty caring for all six of the boys. She delegated F.M. and D.M. to watch the baby so that she could interact with J.M, J.P.M, and M.M.
Thereafter, DSS decided to have S.M. and the children evaluated “to see if a return would be realistic.” In March and April 2000, S.M. and J.M, J.P.M, and M.M. were evaluated by Dr. Ed Bergeron, a psychologist. Dr. Bergeron opined that S.M. is “only able to provide routine care for a couple of children.” He further reported, “As demands on her are increased, she is prone to become overwhelmed and to neglect her parenting duties.” He concluded that it is “doubtful” that S.M. could care for six children at once.[3] Dr. Berger-on expressed that most of S.M.’s parenting problems “stem directly from generally low intellectual functioning, to which there is no remedy.” He ultimately recommended that custody be transferred to “capable relatives or that termination of parental rights be sought.”
J.M.’s evaluation revealed “mild attention deficits.” At the time of his exami *1251 nation, J.M. was nearly eight years old. Academic development testing revealed “adequate intelligence,” despite poor academic performance in school. Dr. Ber-geron opined that J.M. has “special needs,” for which his mother is unable to provide. He concluded that reunification with the mother is “not advised.”
J.P.M. was also evaluated by Dr. Ber-geron, and at the time of the evaluation, J.P.M. was five years old. His intelligence testing revealed “low average range” of intelligence. Dr. Bergeron reported that J.P.M. exhibited “significant behavior problems,” and he meets the criteria for oppositional defiant disorder. He concluded that J.P.M.’s behavioral problems require “above average supervision and monitoring,” which S.M. is unable to provide.
M.M.’s evaluation revealed symptoms of attention deficieni/hyperactivity | ^disorder. However, due to M.M.’s age, four years old, Dr. Bergeron was reluctant to render an official diagnosis. M.M. tested in the “borderline” range for intellectual functioning. Dr. Bergeron opined that M.M. “requires a great deal of monitoring and supervision,” and S.M. is unable to care for him.
As of May 2000, J.M., J.P.M., and M.M. had been in foster care for fifteen months, while F.M., D.M., and T.M. remained in their mother’s custody. DSS continued to recommend continued placement in foster care, as the agency was unable to reunite J.M., J.P.M., and M.M. with their mother.
On September 25, 2000, the DSS filed a petition for termination of the parents’ parental rights and certification for adoption regarding J.M., J.P.M., and M.M. DSS alleged: (1) greater than one year had elapsed since the children had been removed from the parents’ custody; (2) there has been no substantial parental compliance with the case plan for services; (3) there is no reasonable expectation of significant improvement in the parents’ condition or conduct in the near future.
Following a termination hearing held on December 15, 2000, the trial court terminated the parental rights of both parents and certified the children for adoption, finding that DSS “has met its burden of proof.” Both parents appealed the judgment to the court of appeal. The court of appeal affirmed the termination of parental rights with regards to the father, F.H.[4] However, with regards to the mother, S.M., the court of appeal reversed the trial court’s judgment. The court of appeal recognized that the record reveals that S.M. has been “evaluated as having the intelligence in the mild mental retardation range,” and the evidence “demonstrates that S.M. does not possess the intellectual capacity to mother her children.” Nevertheless, the court of appeal concluded that the evidence was insufficient to prove that it would be in the children’s 17best interests to terminate the mother’s parental rights. State in the Interest of J.M., J.P.M., and M.M., 01-0868 (La.App. 3 Cir. 5/01/02), 818 So.2d 802. The court of appeal subsequently denied the State’s application for rehearing.
The State filed an application for writ of certiorari, and by order dated August 9, 2002, this Court granted the State’s writ application. 02-2089 (La.8/9/02), 822 So.2d 601.
DISCUSSION
In Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that natural par *1252 ents have a fundamental liberty interest in the care, custody, and management of their child and that the natural parents’ interest does not “evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.” The Court went on to acknowledge that, while the State has an “urgent interest” in a child’s welfare and in providing the child with a permanent home, as long as there is reason to believe that a positive, nurturing parent-child relationship exists, the State’s interest must favor preservation over severance of natural familial bonds. Id. at 766, 102 S.Ct. at 1401 (quoting Lassiter v. Department of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Thus, the Court found that parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair procedures in order to ensure that children’s legal bonds are not erroneously severed from fit parents. Id. at 753-54,102 S.Ct. at 1395.
In order to adequately protect the parents’ rights in termination proceedings, the Santosky Court held that the clear and convincing evidence standard of proof strikes a fair balance between the natural parents’ rights and the State’s concerns for the child’s welfare and placement in a permanent home. 455 U.S. at 769, 102 S.Ct. at 1403. The Court found that “such a standard adequately conveys to the fact-finder the lslevel of subjective certainty about his factual conclusions necessary to satisfy due process.” Id. Therefore, the State’s interest in finding a child an alternative permanent home arises only when there is clear and convincing evidence that the natural parents cannot or will not provide a normal family home for the child. Id. at 767,102 S.Ct. at 1402.
In termination proceedings, court must carefully balance the two private interests of the child and the parents. State in the Interest of G.J.L. and M.M.L., 00-3278 (La.6/29/01), 791 So.2d 80; State in the Interest of J.A., 00-2375, 00-2504 (La.11/28/00), 774 So.2d 107. While the parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, Lassiter, supra, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. Lehman v. Lycoming County Children’s Servs. Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. State in the Interest of G.J.L. and M.M.L., 791 So.2d at 85; See also State in the Interest of C.J.K. and K.K., 774 So.2d at 113 (quoting State in the Interest of J.A., 752 So.2d at 811); State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445, 452.
This court has always recognized, however, that great care and caution must be exercised in these proceedings because the permanent termination of the legal relationship existing between children and their biological parents is one of the most severe and drastic actions the State can take against its citizens. State in the Interest of G.J.L. and M.L., 791 So.2d at 85; State in the Interest of J.A., 752 So.2d at 811. Parents have a natural, fundamental liberty interest in the continuing companionship, 1 flcare, custody and management of their children, which warrants great deference and vigilant protection under the law. Id. Thus, we recognize that the potential loss to parents is grievous, “perhaps more so than the loss of personal freedom caused by incarceration.” *1253 Id. Because due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child legal relationship, actions to terminate must be scrutinized very carefully. Id.
LSA-Ch.C. art. 1015 provides the grounds for which parental rights may be terminated. LSA-Ch.C. art. 1015(5) provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
In this case, it is undisputed that more than one year has elapsed since J.M., J.P.M., and M.M. were removed from S.M.’s custody pursuant to a court order. The record reveals that the children were placed in foster care on March 23, 1998, and DSS filed its petition to terminate the parents’ parental rights on September 25, 2000. The State contends that it has met its burden of proving that S.M. has not substantially complied with the case plan, and there is no reasonable expectation of improvement of S.M.’s condition and/or conduct.
In order to terminate rights, the court must find that the State has established at least one of the statutory grounds contained in LSA-Ch.C. art. 1015 by clear and convincing evidence. State in the Interest of J.A., 752 So.2d at 811. Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child’s best |!(Interests. LSA-Ch.C. art. 1037(A);[5] State in the Interest of C.J.K. and KK, 774 So.2d at 113.
LSA-Ch.C. art. 1036(C) enumerates the substantive elements proving lack of substantial compliance with a court-approved case plan. This prong may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
Likewise, the substantive elements proving lack of a reasonable expectation of significant improvement in the near future are set forth in LSA-Ch.C. art. 1036(D), *1254 which provides that this prong may be shown by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
|n(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. However, as noted previously, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. State in the Interest of S.M.W., 00-3277 (La.2/21/01), 781 So.2d 1223.
Applying the aforementioned law to this case, we must determine (1) whether the State has established the grounds for termination set forth in LSA-Ch.C. art. 1015(5) by clear and convincing evidence; and (2) whether it is in J.M.’s, J.P.M.’s, and M.M.’s best interests to terminate 5.M.’s parental rights.
At the termination hearing, Mary Ether-idge, the family’s case worker, testified that she became involved in this case when the five children were adjudicated “in need of care,” and the court ordered DSS to supervise J.M., J.P.M., and M.M. Ms. Eth-eridge testified that she periodically met with S.M. to establish goals so that the children would be reunited with her. She testified that the following goals were established: (1) the parents would provide a stable environment for the children, ie., a home to reside in, utilities; (2) the parents would obtain sufficient income to provide for the children; (3) the parents would visit with their children while they were in foster care and “play with [the] children in a responsible manner;” (4) the parents would undergo psychological evaluations.
haMs. Etheridge testified that the after F.H. bought the trailer, S.M. became “very motivated in maintaining a suitable home and in parenting her children.” Additionally, S.M. applied for Social Security Benefits, but she was denied benefits. Thereafter, she did not seek any additional income to provide for the children.[6] S.M. also complied with the request to be psychologically examined.
However, Ms. Etheridge stated that it was difficult to find parenting classes to benefit S.M. because she is “intellectually challenged.” Ms. Etheridge further testified that S.M. “worked very hard at complying with the case plan,” but due to her “intellectual handicap,” she continued to have difficulty maintaining basic standards for the'children. She testified that over time, S.M.’s motivation, as well as her housekeeping standards, deteriorated. She also stated that there was not enough income in the home to provide for some of *1255 the children’s basic necessities, such as medication and medical appointments.
On cross-examination, Ms. Etheridge testified that DSS attempted to work with the school board office to begin parenting classes “for individuals such as [S.M.],” but the plan never came to fruition. She also stated that she later learned of a class being conducted at Louisiana State University, and S.M. attended that class. However, it was only a one-day session. Ms. Etheridge also admitted that for the six month period that the in-home therapist worked with S.M., she was “very motivated and did a good job keeping her house in order and the children’s behavior in check.” She stated that S.M. might benefit from the services of in-home therapist to assist her in caring for her children.
Ms. Etheridge further testified that S.M. kept up with all of her visits with J.M., J.P.M., and M.M., with the exception of two (she missed one to attend a funeral, and hashe forgot one). She stated that most of the visits go well, but others are “chaotic.” She stated that at times, S.M. has been unable to control the children, and T.M. has bitten M.M. “a number of times.” Ms. Etheridge testified that there is a “positive bond” between S.M. and the children, and “they love [S.M.] very much.” She stated that S.M. loves her children, and she has demonstrated that she would be willing to parent them, “within her limitations.”
Dr. Bergeron also testified at the termination hearing. He testified that based on his evaluation, S.M. is passive, lacks coping skills, and does not deal well with stress. Dr. Bergeron stated that S.M. deals with stress by neglecting her obligations and responsibilities. He also stated that because of her “rigid” parenting style, S.M. is at high risk for acts of child abuse.
Dr. Bergeron further testified that S.M. desires to improve her parenting style, but it would be difficult due to her “subaver-age intelligence” and her “personality disorder.” He recommended the placement of a “competent primary caregiver” in the home to assist S.M. Absent that, Dr. Ber-geron again opined that either the children should be placed with a relative, or termination should be sought.
Dr. Lagarde testified that S.M. has a “passive” personality, which made it difficult for her to make decisions and influence events in her family. He described her as “the type of person who would allow things to happen in the family without attempting to have much influence on them.” He opined that she would have difficulty parenting J.M., J.P.M. and M.M., and she would place them in further danger of neglect. Dr. Lagarde opined that because of S.M.’s intellectual limitations and her passive personality, the only real intervention that could help her would be “regular outside assistance.” He stated in his report that S.M. has the “ability to be cooperative when being supervised by others, and she is evidently accustomed to being led and may respond appropriately when other people are helping her to stay L ¿focused on routine parenting tasks.” He concluded that S.M. could care for her children if she had an in-house person who could take primary responsibility for the children’s care.
Based on our review of the record, we conclude that the State has satisfied its burden of proving that S.M. has not substantially complied with the case plan to provide a stable environment for the children, and there is no reasonable expectation of improvement of her conduct. It is undisputed that S.M. loves her children, and she is willing to care for them, within her limitations. However, the evidence is clear that S.M. is simply incapable of managing the care of six children, two of whom have special needs.
*1256 Now, we turn to tbe issue of whether it is in the children’s best interests to terminate S.M.’s parental rights. The court of appeal found that the State failed to prove, by clear and convincing evidence, that the termination of S.M.’s rights would be in the best interests of these children. The court stated:
While the record demonstrates that S.M. does not possess the intellectual capacity to mother her children, it contains no evidence from which we can conclude that it would be in the children’s best interests to terminate her parental rights. S.M. visited with her children and attempted to complete her case plan. Her success in completing the plan, however, was impeded by her intellectual capacity. Even Ms. Etheridge acknowledged that S.M. “worked very hard at complying with her case plan.”
[[Image here]]
S.M. has done her best. We find her best, not being good enough, does not meet the level of proof necessary to forever sever her relationship with these children. In reaching our decision, we considered not only those factors mandated by statute, but a number of additional factors which we found to be important in this case: (1) the strong bond between the children, their mother, and their siblings, with whom they visit regularly; (2) the psychological and emotional impact these children may suffer if denied the right to see their mother and siblings again; (3) the benefits of maintaining the children in long-term foster care where 11fithey can maintain a relationship with their natural family as well as receiving the advantages provided by their foster family; and (4) the probability of adoptive placement, which is less probable for older children and for a sibling “unit” i.e., one placement for all three of the children involved. The record reflects that the children are thriving in their foster home; there is no indication that they will not continue to do so.
818 So.2d at 806.
We recognize that a bond exists between the children and their mother. According to Dr. Bergeron’s reports, J.M. and J.P.M. both desired reunification with their mother. M.M., who was only two years old when he was removed from his mother’s custody, did not express any strong desire to be reunited with S.M. We also acknowledge that S.M. desires a continued relationship with her children. However, we cannot ignore the fact that S.M. has demonstrated an inability to care for all of her children. It is paramount that we place the children’s best interests above that of their mother’s. Children have the right to live in a safe, secure environment and to be reared by someone who is capable of caring for them. Despite her efforts, it is clear that S.M. is incapable of meeting the needs of all six of her children.
Moreover, pursuant to the Adoption and Safe Families Act of 1997, U.S.C.A. 42 § 601, et seq., states are mandated to establish “permanency plans” for children within the foster care system. The Act provides that such plans must demonstrate, inter alia, that the State make reasonable efforts to “preserve and reunify” the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian.
Additionally, Louisiana Children’s Code article 603(15) provides that permanent placement means the return of the legal custody of a child to his parent(s); placement of the child with adoptive parents pursuant to a final decree of adoption; or placement of the child with a legal guardian. Children’s Code article 1003(11) 11fidefines permanent placement as either placement of the child with a legal guard *1257 ian or placement of the child with adoptive parents, pursuant to a final decree of adoption. Thus, permanent placement does not include leaving children permanently in foster care.
It is clear that the federal government, just as the State of Louisiana, does not intend for children to remain in foster care permanently. In fact, one of the goals of the federal Act is “to address the problems of families whose children have been placed in foster care so that reunification may occur in a safe and stable manner in accordance with the Adoption and Safe Families Act of 1997.” See 42 U.S.C.A. § 629(b)(3). Hence, the primary goal is to reunite the family. However, if reunification is not possible, termination is appropriate to free the child or children for adoption.
Certainly, children have a need for permanency. Forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interests of the child. Accordingly, we conclude that the evidence reveals that it is in the best interests of J.M., J.P.M., and M.M. to terminate S.M.’s parental rights. Therefore, the court of appeal’s decision is hereby reversed, and the trial court’s ruling, terminating the parental rights of S.M., is reinstated.

. LSA-Ch.C. art. 612 provides in pertinent part:
A. (1) Upon receiving a report of abuse or neglect of a child who is not in the custody of the state, the local child protection unit of the department shall promptly assign a level of risk to the child based on the information provided by the reporter.
(2) Reports of high and intermediate levels of risk shall be investigated promptly. This investigation shall include a preliminary investigation as to the nature, extent, *1249 and cause of the abuse or neglect and the identity of the person actually responsible for the child’s condition. This preliminary investigation shall include an interview with the child and his parent or parents or other caretaker. Admission of the investigator on school premises or access to the child in school shall not be denied by school personnel.
(3) In lieu of an investigation, reports of low levels of risk may be assessed promptly through interviews with the family to identify needs and available match to community resources. If during this assessment, it is determined that a child is at immediate substantial risk of harm, the local child protection unit shall promptly conduct or participate in an intensive investigation.
[[Image here]]
D. Upon determination that there is reason to believe that the child has been abused or neglected, the local child protection unit shall conduct a more intensive investigation. If necessary, the investigator may apply for an evaluation order authorized by Article 614.

. Although it never appeared in any of the letters from DSS to the trial judge, the family's case worker testified at the termination hearing that a “known perpetrator of physical abuse” resided in the home.

. Dr. Bergeron testified that during his second interview with S.M., T.M., who was two years old at the time, accompanied her. During the interview, Dr. Bergeron stated that he witnessed T.M. hit and bite S.M, as well as pull her hair.

. F.H. did not file a writ application to this court, contesting the court of appeal's ruling upholding the termination of his parental rights. Therefore, the court of appeal’s decision, concerning F.H. is final and will not be discussed in this opinion.

. LSA-Ch.C. art. 1037(A) provides:
When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven true by the evidentiary standards required by Article 1035 and that it is in the best interest of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven.

. The record reveals that the children's father was employed and paid $600.00 per month in child support.