STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-1021

STATE IN THE INTEREST OF C.L.B.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, DOCKET NO. JC-2005-1238
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Jimmie C. Peters, and
James T. Genovese, Judges.

AFFIRMED.

Lloyd Dangerfield
703 East University Avenue
Lafayette, Louisiana 70503
(337) 232-7041
COUNSEL FOR DEFENDANT/APPELLANT:
     A.A.K.

L. Antionette Beard
825 Kaliste Saloom Road
Brandywine I, Room 218
Lafayette, Louisiana 70508
(337) 262-1555
COUNSEL FOR PLAINTIFF/APPELLEE:
     State of Louisiana

**GENOVESE, Judge.**

A.A.K.,[1] the mother of the minor child, C.L.B., appeals a judgment of the trial court terminating her parental rights and certifying the minor eligible for adoption. B.J.B., the biological father of C.L.B., whose parental rights were also terminated, has not appealed the judgment, and his parental rights are not at issue. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

The minor child, C.L.B., was born on January 5, 2005. C.L.B. was placed into the custody of the State of Louisiana, Department of Social Services (DSS), on November 6, 2005, when she was only ten months old. DSS was contacted by the Carencro Police Department, and C.L.B. was taken into state custody after A.A.K. and B.J.B. were arrested for domestic battery in which C.L.B. was allegedly being used as a "human shield" by her parents.

Ms. Heather Walton (Ms. Walton), a child protection investigator for DSS, responded to the police department's call regarding C.L.B. According to Ms. Walton's testimony at the termination hearing, when she reached the home of A.A.K. and B.J.B., she found C.L.B. asleep with a "very soiled" diaper. In addition, "[t]he house smelled of urine. There [were] cat feces on the floor. The police officers that were there didn't want to go open the door to the bathroom for [her] to look around at the condition because they didn't want to have to smell the bathroom again." Ms. Walton was advised by A.A.K. that there was marijuana in the home and that there were no relatives in the state of Louisiana that would be able to care for C.L.B. As a result of Ms. Walton's investigation, C.L.B. was removed from the home of A.A.K.

---

[1]Pursuant to Uniform Rules–Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor child involved in this proceeding.

1

and B.J.B. pursuant to an oral instanter order issued on November 6, 2005 after allegations of "[l]ack of supervision, dependency, threatened harm, and inadequate shelter" were validated. A written instanter order placing C.L.B. into the custody of DSS was signed by the trial court on November 7, 2005. On November 8, 2005, DSS filed an Order of Continued Custody, seeking a hearing to determine whether C.L.B. should be adjudicated a child in need of care pursuant to statute. *See* La.Ch.Code art. 606.[2] On December 6, 2005, the trial court found that there was sufficient evidence to adjudicate C.L.B. as a child in need of care. C.L.B. has remained in the custody of DSS continuously since November 6, 2005.[3]

On March 20, 2007, DSS filed a Petition for Termination of Parental Rights

---

[2]Louisiana Children's Code Article 606 provides:

A. Allegations that a child is in need of care must assert one or more of the following grounds:

(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.

(2) The child is a victim of neglect.

(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.

(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child's welfare is otherwise endangered if left within the parent's custody or control.

(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.

B. A child whose parent is unable to provide basic support, supervision, treatment, or services due to inadequate financial resources shall not, for that reason alone, be determined to be a child in need of care.

[3]Permanency and review hearings were held on May 23, 2006 and October 24, 2006.

2

and Certification of Adoption. The petition alleged:

6.

The parental rights of [A.A.K.] and [B.J.B.] should be terminated pursuant to the provisions of Louisiana Children's Code Article 1015(4),[4] inasmuch as said parents have abandoned their minor child by placing her in the physical custody of a nonparent or the Department or by otherwise leaving her under circumstances demonstrating an intention to permanently avoid parental responsibility, by reason of the following:

> a. As of the filing of this petition, said parents have failed to provide significant contributions to their child's care and support for a period of six consecutive months.

7.

Pursuant to provisions of Louisiana Children's Code Article 1015(5),[5] the parental rights of the parents, [A.A.K.] and [B.J.B.], should be terminated in as much as greater than one year has elapsed since the child was removed from the parents' custody pursuant to a court order, there has been no substantial parental compliance with the

---

[4]The grounds for termination of parental rights due to abandonment according to La.Ch.Code art. 1015(4) are:

> Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> (a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

[5]The grounds for termination of parental rights according to La.Ch.Code art. 1015(5) are:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

3

case plan for services, which plan has been previously filed by the Department and approved by the Court as necessary for the safe return of the child; and, despite earlier intervention, there is no reasonable expectation of significant improvement in the parents' condition or conduct in the near future, considering the child's age and need for a safe, stable, and permanent home, for the following non-exclusive reasons, to-wit:

a. The parents failed to cooperate in the case plan established for reunification of the family;

b. The parents have failed to regularly exercise court approved visitations with their minor child;

c. The parents have failed to contribute to the cost of the child's foster care as ordered by the court when approving the case plan;

d. The parents have repeatedly failed to comply with the required program of treatment and rehabilitation services provided in the case plan;

e. The parents have shown a lack of substantial improvement in redressing the problems which have prevented reunification;

f. The conditions that led to removal, or similar potentially harmful conditions, continue to persist;

g. The parents suffer from mental illness and/or mental deficiency, which renders them unable and/or incapable of exercising parental responsibilities without exposing the minor child to a substantial risk of serious harm, based upon expert opinion and/or based upon an established pattern of behavior; and,

h. The parents' conduct reasonably indicates that they [are] unable or unwilling to provide an adequate permanent home for their minor child, based upon an established pattern of behavior.

A hearing on DSS's petition to terminate the parental rights of A.A.K. and B.J.B. was held on April 24-25, 2007. At the conclusion of the hearing, the trial court took the matter under advisement. On May 1, 2007, the trial court rendered its judgment terminating the parental rights of A.A.K. and B.J.B. and declared C.L.B.

4

free for adoption. Only the mother, A.A.K., appeals.

## ASSIGNMENTS OF ERROR

A.A.K. asserts three assignments of error:

1.  The trial court erred in terminating the rights of [A.A.K.] for substantial non-compliance when she had completed several components of the case plan and was recently involved in psychological counseling.

2.  The trial court erred in terminating the rights of [A.A.K.] where there was a reasonable expectation for improvement in [A.A.K.]'s condition.

3.  The trial court erred in finding that termination was in the best interest of the child when considering the overall circumstances and notwithstanding [A.A.K.]'s slow progress due to economics.

## LAW AND DISCUSSION

Our supreme court has recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof than the preponderance of the evidence standard; rather, the State must prove by clear and convincing evidence at least one of the statutory grounds contained in La.Ch.Code art. 1015 in order to terminate a parent's rights. *See State ex rel. J.M.*, 02-2089 (La. 1/28/03), 837 So.2d 1247; La.Ch.Code art. 1035(A).[6] "Further, even upon finding that the State has met its evidentiary burden, a court still should not terminate parental rights unless it determines that to do so is in the child's best interests." *State ex. rel. J.M.*, 837 So.2d at 1253; *see also* La.Ch.Code art. 1037(B).[7]

---

[6]Louisiana Children's Code Article 1035(A) provides that "[t]he petitioner bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence."

[7]Louisiana Children's Code Article 1037(B) provides:

> When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

In *State in the Interest of S.M.W., C.D.W., C.N.W., and E.S.W.*, 00-3277, p. 14, (La. 2/21/01), 781 So.2d 1223, 1233, our supreme court set forth the standard of review applicable to this case:

> "It is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong." *In re A.J.F.*, 00-0948 (La.6/30/00), 764 So.2d 47, 61. "Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court." *Id.*; *Rosell v. ESCO*, 549 So.2d 840 (La.1989). "[I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Rosell*, *supra* at 844. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong." *Id.* "In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify." *In re A.J.F.*, *supra* at 62. "The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record." *Id.*

Louisiana Children's Code Article 1036(C) sets forth the evidence which may prove the lack of substantial parental compliance with the case plan as required by La.Ch.Code art. 1015(5):

> C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

6

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Likewise, La.Ch.Code art. 1036(D) sets forth the substantive elements which may prove the lack of a reasonable expectation of significant improvement as required by La.Ch.Code art. 1015(5):

D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

A.A.K. contends that the trial court erred in finding "substantial non-compliance when she had completed several components of the case plan and was recently involved in psychological counseling." A.A.K. argues that the record shows that she substantially complied with her case plan. In her brief, A.A.K. asserts:

the initial case worker [Ms. Nate Dufrene], in May 2006, indicated that [A.A.K.] had (1) attended the initial assessment at Lafayette Addictive Disorders Clinic; (2) maintained housing; (3) made herself available for home visits; (4) had been consistent in visiting with C.L.B.; (5) she was employed and referrals had been made to Good Will for Family

7

Violence Intervention Project and Tyler Mental Health, although she had not attended their programs.

A.A.K. asserts that she complied with significant portions of the case plan. She argues that the law does not require compliance with, or completion of, all components of a case plan. Further, she contends that economic reasons were to blame for her not paying child support, not securing adequate housing, and not always securing transportation to attend her required therapy sessions. Therefore, A.A.K. contends that the trial court erred in finding that DSS proved by clear and convincing evidence that she failed to satisfy any of the requirements contained in La.Ch.Code art. 1015. Alternatively, A.A.K. contends that the trial court erred in terminating her parental rights "where there was a reasonable expectation for improvement in [her] condition." Finally, A.A.K. asserts that her slow progress was due, in large part, to economic hardship.

Dr. Ed Bergeron (Dr. Bergeron) was called to testify by DSS. Dr. Bergeron, accepted by the trial court as an expert in the field of family psychology and medical and clinical psychology, testified that his initial evaluation of A.A.K. was on May 22, 2006. The purpose of his evaluation was to ascertain if A.A.K. was suffering from any type of psychological issue that would in any way interfere with her ability to function as a primary care-giver of a minor child. Based on his formal assessment of A.A.K.'s personality, Dr. Bergeron diagnosed A.A.K. with depressive disorder with agitated features. Dr. Bergeron testified that A.A.K. exhibited "some very serious psychological problems. In particular, the profile indicated what is often termed as deep-seated issues, meaning that they are very ingrained and resistant to change. They have become part of her personality to a large extent." Based upon his findings, Dr. Bergeron did not recommend reunification between C.L.B. and her mother at that

time; however, Dr. Bergeron opined that A.A.K. "was in need of mental health services which would include individual psychotherapy and . . . medication" to "increase coping skills and try to resolve the underlying psychological problems and emotional scarring."

Dr. Bergeron provided individual counseling to A.A.K. from January 3, 2007 until April 4, 2007. During this period of time, A.A.K. often failed to appear for her sessions with Dr. Bergeron. According to Dr. Bergeron, A.A.K. initially resisted his effort to prescribe antidepressant medication for her, but, on March 21, 2007, she agreed to take the medication. However, after the medication was prescribed, A.A.K. failed to appear for any other appointments with Dr. Bergeron. When asked whether he felt that A.A.K. had made any progress during her therapy sessions, Dr. Bergeron answered, "I do want to say first off she was very cooperative and did seem to try hard. But based on a couple of things, I do not see significant improvement."

Ms. Nate Dufrene (Ms. Dufrene), the foster care case manager initially in charge of C.L.B.'s case, testified at the termination hearing as to her involvement during the first six months of C.L.B.'s case plan. According to Ms. Dufrene, the first case plan, which was directed towards reunification, was established on December 5, 2005. This plan asked A.A.K. and B.J.B. to: (1) maintain stable housing for six months; (2) provide child support; (3) maintain employment; (4) exercise visitation; (5) attend the Family Violence Intervention Program; and (6) submit to evaluations at the Lafayette Addictive Disorders Clinic.

According to Ms. Dufrene, during her six months of supervising this case, A.A.K. and B.J.B. moved twice. During announced visits, Ms. Dufrene found A.A.K.'s and B.J.B.'s home to be relatively clean. However, during her one

9

unannounced visit, Mr. Dufrene noticed that there were multiple cats in the home, and dirty dishes, and she opined that "the house was dirty." Ms. Dufrene testified that A.A.K. had obtained employment, but only once; that employment lasted approximately one month before she was fired. Also, A.A.K. did not provide child support for C.L.B. With regard to visitation, A.A.K. had visitation with C.L.B. every other week for an hour and a half. Though she regularly exercised this visitation, Ms. Dufrene testified that she observed A.A.K. "spend [sic] probably half to over half the time outside smoking cigarettes or complaining about the lack of time that she had to visit with her child." According to Ms. Dufrene, A.A.K. was arrested on May 7, 2006 for criminal trespass, allegedly resulting from an altercation with one of her neighbors. A.A.K. admitted to Ms. Dufrene that she had used ecstasy; however, a drug screen performed approximately two months after C.L.B.'s removal was negative for drug use.

When questioned about her observations of the visits between A.A.K. and C.L.B., Ms. Dufrene testified that she found that "C.L.B. seemed to be a little uncomfortable around A.A.K." According to Ms. Dufrene, A.A.K. sometimes brought items for C.L.B. which were inappropriate, considering her young age. Ms. Dufrene established a second case plan on May 22, 2006; however, she left her employment with DSS shortly thereafter.

After Ms. Dufrene's departure, DSS foster care case manager, Ms. Jael Dugas (Ms. Dugas), assumed responsibility for C.L.B.'s case. According to Ms. Dugas:

> The basic components of the second case plan [dated May 22, 2006] were visitation to maintain a bond with the child and to also demonstrate any learned parenting skills that they had learned through the services they completed. Housing, to maintain stable housing, paid utilities, clean adequate shelter. Also we had addressed transportation at that time because transportation was an issue with [A.A.K.] and

10

[B.J.B.] getting to the services that they were referred to. Child support was also ordered in that case plan, and to address their psychological issues that had come from the psychological evaluations conducted by Dr. Bergeron.

Attending the Family Violence Intervention Program, maintaining employment, and attending parenting classes, which were part of the initial case plan, were continued as part of the second case plan directed towards reunification.

The record reflects that both A.A.K. and B.J.B. successfully completed the four-week "Parenting Wisely!" program at The Extra Mile Family Resource Center from June 12, 2006 through July 3, 2006. However, according to Ms. Dugas, neither A.A.K. nor B.J.B. attended any of their scheduled visitations with C.L.B. during June and July of 2006. A.A.K. did not visit C.L.B. again until August 21, 2006. When she tried to contact A.A.K. and B.J.B. to inquire why they were missing their visits with C.L.B., Ms. Dugas reached a phone number that had been disconnected. A.A.K. eventually contacted Ms. Dugas and explained that she and B.J.B. had moved out of their previous home and were planning to move into a new home. A.A.K. demonstrated a persistent failure to maintain contact with DSS.

In the interim, between their move from their former home to yet another home, A.A.K. and B.J.B. were living with B.J.B.'s father, and A.A.K. alleged that they did not have transportation to exercise their visitation with C.L.B. According to Ms. Dugas, she offered A.A.K. and B.J.B. assistance by arranging transportation for them to be able to get to their visits. However, A.A.K.'s attendance was still not consistent. Ms. Dugas stated that the visits were changed to only once a month and that "beginning in January [2007], [A.A.K.] consistently visited with [C.L.B.] because the case plan was changed to adoption." Ms. Dugas testified that "[t]ransportation was a big issue because [C.L.B.] has a lot of allergies. She takes allergy shots every

11

week and she was actually hospitalized . . . two times since she has been in foster care due to getting very sick from her allergies and asthma and dehydration." When questioned if she knew how A.A.K. and B.J.B. were transported to the hearing in this matter, Ms. Dugas admitted, "I picked them up."

When Ms. Dugas described the visits between A.A.K. and C.L.B., she found A.A.K. had a difficult time interacting with C.L.B. Like the previous case worker, Ms. Dugas also observed A.A.K. bringing items for C.L.B. which were inappropriate considering her young age, such as make-up and a ring.

According to Ms. Dugas, when she assumed responsibility for C.L.B.'s case in June of 2006, A.A.K. and B.J.B. were living with B.J.B.'s father. Though the exact date is unclear, at some point A.A.K. and B.J.B. did move into a home where they remained until approximately February of 2007. Ms. Dugas described the home as "a problem." Ms. Dugas observed cat feces in the home, broken windows, and insulation hanging out of some of the walls. Ms. Dugas was advised by A.A.K. that the gas had never been connected during the seven months that they lived in the home, and, during two of those months, there was no electricity in the home.

The home in which A.A.K. and B.J.B. were residing on the date of the termination hearing was described by Ms. Dugas as "appropriate." When questioned under cross-examination whether A.A.K. had "moved into a smaller, more manageable home," Ms. Dugas answered, "I can't say it's more manageable because I have not received any receipts to see how much the utilities cost, how much water cost[s], how much rent is. So I don't know if it's more manageable." But Ms. Dugas did concede that the home did "look better" and was "more suitable."

According to Ms. Dugas, A.A.K. had recently attended the Family Violence

12

Intervention Program; however, when asked whether attendance equated to completion of the program, Ms. Dugas responded, "[A.A.K.] . . . completed going to the classes. Has she demonstrated that she can handle the stressors and not, you know, become angry and cooperate with co-workers, no, she has not." Based on her observations during her supervision of this case, Ms. Dugas stated that termination of A.A.K.'s parental rights would be in the best interest of C.L.B.

According to A.A.K., the battery charges stemming from the alleged domestic disturbance between she and B.J.B. on November 6, 2005, were dropped "for lack of evidence. The people that testified, the neighbors that testified and said that we were using the child as a shield would not go to court and testify." A.A.K. also testified that she "feel[s] I have done nothing but cooperate;" however, she admitted that she did not maintain a job, did not acquire a means of transportation, and never paid child support. A.A.K. acknowledged her initial refusal to take an antidepressant medication as recommended by Dr. Bergeron and blamed her reluctance on the death of her newborn son. A.A.K. did admit to smoking in the presence of C.L.B. during their visits, but explained that she did not smoke "in [her] face."

When questioned on cross-examination, A.A.K. acknowledged that the situation surrounding her visits with C.L.B., i.e., the foster mother's presence, the social worker's presence, and C.L.B.'s active nature, would make her nervous. When asked whether she felt that she was able to use good judgment at this point in her life, A.A.K. responded, "Yes, I do." A.A.K., however, admitted to having had an affair in November of 2006 which created tension between her and B.J.B. A.A.K. also admitted that she attempted to bring her two-week-old puppy into the courthouse on the day of the termination hearing by hiding it in her shirt. Finally, A.A.K. disputed

13

the testimony of Ms. Walton and Ms. Dugas that cat feces were found in the home on more than one occasion.

The evidence unequivocally reflects that during the *seventeen months* since C.L.B. has been in the custody of DSS, A.A.K. failed to secure employment, failed to maintain adequate housing for a satisfactory length of time, failed to pay child support, and failed to obtain a means of transportation. Further, in its written reasons for judgment, the trial court stated:

> Probably the most concern to this Court is [A.A.K.]'s psychological limitations, which hinder her ability to care for her child. Dr. Ed Bergeron testified that [A.A.K.] had been referred to him for therapeutic counseling and medication management. He testified that she suffers from "deep-seated serious psychological problems, including depression and an inability to cope with stress." He indicated that she had sporadic attendance at treatment and, while cooperative, she still had serious coping skill problems.

The record before this court clearly supports the trial court's finding that A.A.K. demonstrates unstable and unhealthy behavior. Collectively, the testimony of Ms. Walton, Ms. Dufrene, and Ms. Dugas supports the trial court's finding that the grounds enumerated in La.Ch.Code art. 1036(C) were duly established. Also, the expert opinion of Dr. Bergeron supports the trial court's finding that the grounds enumerated in La.Ch.Code art. 1036(D)(1) and (3) were likewise duly established and that these finding were clearly reasonable.

A.A.K.'s ability to care for C.L.B. is greatly overshadowed by her inability to cope with stress. A.A.K.'s compliance with the case plan was, at best, sporadic. In fact, much of A.A.K.'s compliance began after DSS notified her that its case plan objective had changed from reunification to adoption. The trial court did not find that A.A.K's efforts were sufficient, nor do we. These findings were supported by the record and were reasonable in light of the record in its entirety. It is noteworthy that,

14

at the time of trial, A.A.K. had had over seventeen months to comply with her reunification case plan and be a respectable mother to this child. C.L.B. has been in foster care since she was ten-months-old. The child will be three years old this January. The trial court's findings were neither clearly wrong nor manifestly erroneous. We find that the trial court was correct in finding that the State proved by clear and convincing evidence sufficient grounds for termination under La.Ch.Code art. 1015(5) and that termination was in the best interest of the minor child.

## DECREE

Based on our thorough review of the record in these proceedings, we find no manifest error by the trial court. We also find that the trial court was not clearly wrong in finding that the State satisfied its burden under La.Ch.Code art. 1015. We further conclude that it is in the best interest of the minor child, C.L.B., that the parental rights of A.A.K be terminated. Accordingly, the judgment of the trial court is affirmed.

**AFFIRMED.**

15