WALTER J. ROTHSCHILD, Judge.
| ¿The mother, L.M., appeals a judgment of the juvenile court for Jefferson Parish terminating her parental rights to two of her minor children, D.M. and G.M. For the reasons which follow, we affirm the judgment of the juvenile court.

FACTS AND PROCEDURAL HISTORY

D.M. was born on February 15, 2002. G.M. was born on April 5, 2005. On July 25, 2005, G.M. was admitted to Children’s Hospital where it was determined that she had a spiral fracture to her left arm and two fractured ribs that were at different stages of healing. Examination of G.M. further revealed that she had a torn frenu-lum, which is consistent with an object being shoved into her mouth, and a laceration to her liver, which is consistent with blunt trauma. The child protection investigator initially received several different stories from L.M. and others regarding how G.M. sustained these injuries. After further investigation, RG.M.'s father, G.G.Jr., was arrested, and thereafter, he pled guilty to second degree cruelty to a juvenile.
In August 2005, the children were brought into the custody of the State of Louisiana, Department of Social Services, Office of Community Service (“the State”), and they were placed with the maternal grandfather and his wife (hereinafter referred to as “the grandparents”). On October 14, 2005, the Jefferson Parish District Attorney filed a “Children in Need of Care” petition and, on December 6, 2005, the children were adjudicated to be in need of care due to failure of the mother, L.M., to adequately supervise and protect them. The State retained custody of the children and they remained in the care of the grandparents.
Initially, the goal for the mother and children was reunification. A case plan was developed by the State and approved by the juvenile court on January 17, 2006. The case plan required L.M. to participate and cooperate with the Infant Team, attend appointments as scheduled, follow the Infant Team’s recommendations, maintain monthly in-person contact with the State, participate in supervised visits with the children, maintain safe and stable housing for the children, demonstrate an understanding of the parenting education learned and her ability to protect her children from harm, and pay $100 per month in child support.[1] L.M. was warned by the *143 trial court that failure to complete the case plan could result in termination of her parental rights.
On January 4, 2007, the State filed a Petition for Termination of Parental Rights seeking to terminate the rights of D.M.’s father, D.L., G.M.’s father, G.G.Jr., and the mother, L.M. The petition alleges that L.M.’s parental rights should be terminated, because she failed to substantially comply with the court-approved case plan and there is no reasonable expectation of significant | improvement in L.M.’s conduct in the near future.[2] Trial on the Petition for Termination of Parental Rights was held on March 20 and 21, 2007.
At trial, Nell Flanagan testified that this case was assigned to her on December 9, 2005, and she was the primary foster care worker. She explained that D.M. and G.M. were taken into custody by the State because G.M. had an unexplained fracture to her arm on July 25, 2005 and while she was at the hospital, it was discovered that she had other injuries, including mouth trauma, a lacerated liver, and fractured ribs, which were at least two weeks old. She stated that the agency validated the lack of supervision claim against L.M., a case plan was prepared for and signed by L.M., and it was approved by the court. She indicated that the case plan required L.M. to maintain contact with the agency, cooperate with the Infant Team and follow their recommendations, participate in visits with the children, maintain safe and stable housing, demonstrate an ability to protect the children from harm, and pay $100 per month in child support.
Ms. Flanagan testified that D.M. and G.M. were placed with the grandparents, who were living in New Orleans at the time the children were taken into State custody. However, the grandparents relocated to Augusta, Georgia after their home was destroyed by Hurricane Katrina. The State provided two plane tickets for L.M. to visit the children in Georgia, but L.M. did not maintain consistent contact with the children. The grandparents relocated to Jackson, Mississippi in August 2006, and L.M. provided her own transportation on two occasions to visit the children in Jackson. She stated that L.M.’s visits with the children were once a month on average, and usually when the grandparents brought them to New Orleans. Ms. Flanagan testified that L.M. did not fully cooperate with the Infant Team, because she did not follow their recommendations lfito move closer to her children. L.M. refused to move to Augusta, even though the grandparents offered to allow L.M. to stay with them and the children. In September 2006, L.M. agreed to move to Jackson and she looked at an apartment there. However, Ms. Flanagan did not believe L.M. was genuinely trying to move, and L.M. never did move to Jackson. According to Ms. Flanagan, L.M. stated that she had to stay in the New Orleans area to complete a manager training course for her job at Burger King, which would start in December 2006 and would last about six weeks. Ms. Flanagan told L.M. that she believed that was too long to wait to be with the children.
Ms. Flanagan opined that L.M. has not demonstrated an ability to protect her children from harm. She noted that L.M. maintained a relationship and conceived another child with G.M.’s abuser, G.G.Jr., after the children were taken into State custody. She stated that after the charges against G.G.Jr. were resolved, L.M. told *144 her that G.M.’s injuries were not that bad because G.G.Jr. only got probation. Ms. Flanagan also stated that L.M. never seemed to understand the lack of supervision validation against her, because she often told Ms. Flanagan, “I didn’t do anything. I wasn’t there.” She further stated that she believes L.M. is in denial about the seriousness of G.M.’s injuries and the fact that G.M. almost died from these injuries.
In Ms. Flanagan’s opinion, L.M. has not shown substantial improvement in understanding the issues that brought her children into care and she has not demonstrated that she will make significant improvement in the near future. She stated that she does not believe that the children would be safe if returned to L.M.’s custody. She believes that it is in the children’s best interest for them to be adopted by the grandparents.
|,;Jackie Randolph testified that she is the current case manager for the State in this case. The case was assigned to her in February 2007 and she met with L.M. one time. L.M. told her that G.M. fell out of bed and broke her arm while at the home of her father, G.G.Jr., when L.M. was at work. L.M. also told her that she did not need anything more from the Infant Team and that she was finished working with them.
Dr. Charles Zeanah, the director of the Infant Team and an expert in child psychiatry, was the primary clinician in this case since June 2006 and he provided a series of individual therapy sessions with L.M. He stated that some primary treatment goals for L.M. were for her to understand that G.M.’s injuries were non-accidental, to understand how to protect herself and the children from exposure to potentially violent men, and to appreciate the importance of putting her children’s needs above her own needs. He stated that L.M.’s participation with the Infant Team was sporadic. There were times that she regularly attended her sessions, but other times she did not attend at all. She attended four sessions in June 2006, but after she gave birth to her third child in July 2006, she missed a series of scheduled sessions. At the family session in September 2006, L.M. agreed to meet regularly with the Infant Team, but she never met with them again.
Dr. Zeanah stated that when L.M. initially met with the Infant Team, she denied that G.M. had been abused. When he met with L.M. in June 2006, he thought she had made some progress, because he believed that she had come to terms with the fact that G.M.’s injuries were non-accidental. However, Dr. Zeanah stated that he spoke with the current case worker, Jackie Randolph, and learned that L.M. told Ms. Randolph in February 2007 that G.M.’s injuries were accidental, which was a significant setback in the progress he believed L.M. had made. Based on L.M.’s statement to Ms. Randolph, Dr. Zeanah believes that |7L.M.’s therapy would have to start over again. He further opined that it would take more than a year for L.M. to make significant progress in becoming a safe and effective parent. He believes that adoption is in the children’s best interest.
At trial, L.M. admitted that she conceived another child with G.G.Jr. in October 2005, which was after D.M. and G.M. were placed into State custody because G.M. was abused and seriously injured by G.G.Jr. She stated that at that time, she was immature and still believed that G.M.’s injuries were caused by accident. However, she stated that she now knows that G.M.’s injuries were not an accident and that they were the result of abuse by G.G.Jr. L.M. denied ever telling Ms. Flanagan that G.M.’s injuries were not severe.
*145 L.M. further testified that she had intended to move to Jackson to be with her children, but the apartments she looked at were not livable. L.M. offered several reasons for failing to attend all of her sessions with the Infant Team, including lack of transportation when her mother’s car was in the shop, the birth of her third child, and Dr. Zeanah’s failure to show up one time. L.M. stated that she attended more sessions with the Infant Team than Dr. Zeanah had said.
Several other witnesses, including the grandparents, testified at trial. At the conclusion of trial, the trial judge ordered the parties to submit post-trial memoran-da. Thereafter, on May 16, 2007, the trial judge rendered a judgment terminating L.M.’s parental rights to D.M. and G.M.[3] L.M. appeals.

LAW AND DISCUSSION

In termination proceedings, the court must carefully balance the interests of the children and the interests of the parents. State ex rel. J.M., 02-2089, p. 8 (La.1/28/03), 837 So.2d 1247, 1252. While a parent has a natural fundamental interest in the continuing companionship, care, and custody of their children, the child has |sa profound interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term and continuous relationships found in a home with proper parental care. State ex rel. L.B. v. G.B.B., 02-1715, p. 4 (La.12/4/02), 831 So.2d 918, 921; State ex rel. G.J.L., 00-3278, p. 6 (La.6/29/01), 791 So.2d 80, 85; Lehman v. Lycoming County Children’s Services Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). In balancing these interests, courts have consistently found that the interest of the child is paramount over that of the parent. State ex rel. G.J.L., 00-3278 at p. 6, 791 So.2d at 85.
In a termination of parental rights proceeding in Louisiana, the law provides that a parent’s rights shall be terminated if the State proves at least one of the statutory grounds for termination of parental rights, as set forth in LSA-C.Ch. art. 1015, by clear and convincing evidence. LSA-Ch.C. art. 1035; State ex rel. T.P.M., 06-530, p. 3 (La.App. 5 Cir. 11/28/06), 947 So.2d 751, 753; State ex rel. A.T., 06-501, p. 5 (La.7/6/06), 936 So.2d 79, 82. In addition, the trial judge must also find that termination of the parent’s rights is in the best interest of the child. State ex rel. A.T.C., 06-562 (La.App. 5 Cir. 11/28/06), 947 So.2d 71, 75.
In the present case, the State sought to terminate L.M.’s rights for the grounds set forth in LSA-Ch.C. art. 1015(5), which provides:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child removed from the parent’s custody pursuant to. a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
LSA-Ch.C. art. 1036(C) provides that lack of parental compliance with a case plan may be evidenced by one or more of the following:
Ifll) The parent’s failure to attend court-approved scheduled visitations with the child.
*146 2) The parent’s failure to communicate with the child.
3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
6) The parent’s lack of substantial improvement in redressing problems preventing reunification.
7) The persistence of conditions that led to removal or similar potentially harmful conditions.
Reformation sufficient to prevent termination of parental rights requires that the parent demonstrate substantial change, such as significantly altering or modifying the behavior that resulted in the State’s removal of the child from the parent’s home. State in Interest of H.D., 98-0953, pp. 6-7 (La.App. 4 Cir. 11/4/98), 721 So.2d 1045, 1048; State in Interest of B.J., 95-1915 (La.App. 1 Cir. 4/4/96), 672 So.2d 342, 347, writ denied, 96-1036 (La.5/31/96), 674 So.2d 264. A reasonable expectation of reformation or significant improvement in the near future exists if the parent has cooperated with State officials and has shown improvement, although all of the problems have not been eliminated. State in Interest of S.M., 98-0922, p. 10 (La.10/20/98), 719 So.2d 445, 450; State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La.1993).
On appeal, L.M. asserts that the trial court erred in terminating her parental rights, because the State of Louisiana did not make reasonable efforts to reunite her with her children. Our review of the record reveals that the State did in fact make reasonable efforts to assist L.M. with her case plan and to reunite her with her children. Further, the State has proven by clear and convincing evidence that L.M. did not substantially comply with her case plan and that there is no reasonable expectation of significant improvement in the near future. The testimony and |10evidence revealed that L.M. did not pay child support, did not follow the Infant Team’s recommendations, did not consistently participate and cooperate with the Infant Team, and did not maintain consistent visitation with D.M. and G.M. In addition, L.M.’s actions have not demonstrated that she is capable or willing to do what is necessary to protect her children. In fact, approximately one month before trial, L.M. indicated that she believed G.M.’s injuries were accidental, despite the findings in the medical reports and G.G.Jr.’s guilty plea to second degree cruelty to a juvenile.
L.M. claims that her parental rights should not have been terminated based on failure to substantially comply with the case plan, because the children should have remained in New Orleans in order for reunification to take place. We find this argument to be unpersuasive. Unfortunately, the' grandparents were forced to move out of state when Hurricane Katrina destroyed their home. The Infant Team believed that after all of the disruptions in their lives, it was in the children’s best interest not to disrupt their placement with the grandparents to whom they had become emotionally attached. The Infant Team believed it would have been better for L.M. to put her children’s needs before her own by relocating in order to be with them. In September 2006, L.M. agreed to move to Jackson and the Infant Team was going to work to establish mental health services for them there. However, L.M. *147 never moved to Jackson. In her reasons for judgment, the trial judge noted that L.M. failed to make an effort to relocate in order to be closer to her children, even though the Infant Team advised her that it was in her children’s best interest and even though the grandparents offered to allow L.M. to live with them.
In addition, although the case plan required L.M. to pay $100 per month in child support and she was consistently employed by Burger King, the record Inreveals that L.M. did not pay any child support for the children. The grandfather testified that L.M. provided some gifts for the children, but she told him that she was not going to pay child support because the State was financially providing for the children.
We agree with the trial court that the State has shown by clear and convincing evidence that L.M. has not substantially complied with the case plan. Moreover, Dr. Zeanah believes that L.M. would have to start over with her therapy and that it would take more than a year for her to make substantial progress. Based on all of the testimony and evidence in this case, the State has shown by clear and convincing evidence that L.M. has not shown a reasonable expectation of significant improvement in the near future, considering the children’s ages and their need for safe and stable environment.
 In addition to establishing a statutory ground for termination of parental rights, the trial court must also find that termination is in the best interest of the child. State ex rel. S.M.W., 00-3277, p. 14 (La.2/21/01), 781 So.2d 1223, 1233. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parent to be terminated. State ex rel. J.A., 99-2905, pp. 8-9 (La.1/12/00), 752 So.2d 806, 811. In this case, L.M. asserts that it is not in the best interests of D.M. and G.M. for her parental rights to be terminated. We disagree.
The children were very young when taken into State custody in August 2005. D.M. was 3½ years old and G.M. was four months old. According to Dr. Zeanah, D.M. showed aggressiveness and was diagnosed with an attachment disorder, which was likely caused by severe neglect and witnessing violence. As an infant, G.M. was physically abused by her father and suffered injuries. These 112children need a safe, stable and permanent home. The children have been in foster care with the grandparents since August 2005 and have become emotionally attached to them. Meanwhile, L.M. has shown little progress since the children were taken into custody and there is no reasonable expectation that she significantly improve in the near future, considering the children’s ages and their need for a safe and stable home.
A child has an interest in the termination of rights that prevent adoption and inhibit the child’s establishment of secure, stable, and continuous family relationships. State in the interest of J.M., 30,302, p. 9 (La.App. 2 Cir. 10/29/97), 702 So.2d 45, 50, writ denied, 97-2924 (La.2/6/98), 709 So.2d 736. Considering all of the testimony and evidence in the present case, we agree with the trial judge that it is in the children’s best interest that L.M.’s parental rights relative to D.M. and G.M. be irrevocably terminated, and that these children are free to be adopted.

DECREE

For the foregoing reasons, we affirm the May 16, 2007 judgment of the juvenile court terminating L.M.’s parental rights to D.M. and G.M.

AFFIRMED.

. The original case plan did not require L.M. to pay child support. However, the case plan *143 was later amended to require L.M. to pay $100 per month in child support.

. The only allegations noted are those against L.M., because this appeal pertains solely to the termination of L.M.’s parental rights.

. The May 16, 2007 judgment also terminated the parental rights of D.M.’s father, D.L., and G.M.'s father, G.GJr. Neither father has appealed the judgment.