FREDERICKA HOMBERG WICKER, Judge.
1 ^Appellant seeks review of a trial court judgment terminating her parental rights. For the following reasons, we affirm.

PROCEDURAL HISTORY

In August of 2009, seven-year old M.B.[1] was placed in foster care based on lack of *1239 supervision, inadequate shelter, and allegations of physical abuse. M.B. was adjudicated a child in need of care on September 15, 2009, and since that time has remained either in the custody or under the supervision of the Department of Children and Family Services (DCFS).[2] After reunification efforts were successfully completed, physical custody of M.B. was returned to her mother, UKB., on January 27, 2011, but legal custody remained with DCFS. On August 10, 2011, K.B. obtained legal custody of M.B., with DCFS ordered to continue supervision for three months. Prior to the end of the three-month period, on October 11, 2011, M.B. was again placed in DCFS’s custody. Rather than maintaining the prior case[3], DCFS closed that case and filed a new petition to have M.B. adjudicated a child in need of care.[4] The trial court consolidated the cases without objection.
On December 6, 2011, DCFS filed a petition to terminate parental rights. Trial began on March 8, 2012, but was recessed because various witnesses had not been subpoenaed. Trial concluded on March 26, 2012. On that date, the trial judge terminated KB.’s parental rights pursuant to La. Ch.C. art. 1015(5) and (3)(i) and (j).[5]

FACTUAL BACKGROUND

In August of 2009, M.B. was placed in foster care after she reported to school with a black eye and gave conflicting reports of the injury’s cause. A case worker inspected the child’s home and found it to be in “deplorable condition.” Following the home inspection, the case worker received multiple reports from neighbors expressing concern for M.B.’s safety. Neighbors reported that KB. prostituted in her home while the child was present and that M.B. often walked the neighborhood looking for transportation to school when she missed the school bus. When M.B. was initially placed into DCFS’s custody, she was described as feral with no social skills or structure; she did not know how to brush her teeth or maintain her personal hygiene.
|4In March of 2010, M.B. was placed with K.B.’s cousin, R.G., and his wife in Florida. K.B. later moved to Florida and her relatives fixed up a rental property that they owned and allowed KB. and M.B. to live in the home rent-free and also paid the electric bill. During their time in Florida, K.B. and M.B. received counseling and worked toward reunification. On August 10, 2011, the trial court granted K.B. legal custody of M.B. and ordered that K.B. remain under the supervision of DCFS for a period of three months.
At some point in August 2011, K.B. impulsively left Florida and returned to Louisiana, where she had no job or permanent housing established. R.G. testified that he and his wife supported K.B. financially and physically helped care for M.B. for over a year; eventually, R.G. became discouraged and “booted” K.B. out of his rental property because she consistently refused to work to provide for herself or her child.[6] *1240 The record reflects that, after their return to Louisiana, K.B. and M.B. moved in and out of her sister’s home in St. Rose fourteen times in a two-month period and spent the rest of the time between three friends’ homes either on a couch or a floor pallet.
The testimony of school counselors reflects that M.B. reported that she did not know where she would be sleeping from day to day and that K.B.’s car was “filled to the brim” with personal belongings as if she had been living out of her car. The CASA volunteer assigned to M.B.’s case testified that this instability made M.B. uncomfortable.
Ms. Dana McGary, a child welfare specialist with the St. John Parish Department of Children and Family Services, testified that she began receiving | ¡¡phone calls or concerns about M.B.’s care within one month of K.B. relocating to Louisiana. The reports indicated that KB. did not have stable living arrangements, that she belittled M.B., and that she isolated M.B. from her family in Louisiana. The testimony reflects that M.B. was forced to go outside while K.B. smoked and was not permitted to watch television or play with toys or other children. In October of 2011, M.B.’s school contacted DCFS to report concerns for the child’s well being. M.B.’s school, which had a history with the family, had been unable to contact K.B. while M.B. was at school with symptoms of a fever, headache, and stomachache. On October 11, 2011, the trial court issued a verbal instanter order returning legal custody of M.B. to DCFS. M.B. was placed with her maternal aunt and uncle in St. Rose, Louisiana.
Dr. Scuddy Fontenelle evaluated M.B. in October of 2009 and again in November of 2011. Dr. Fontenelle found that M.B. was a child of average to above average intelligence and diagnosed her with adjustment disorder of childhood secondary to family dysfunction and emotional abuse. He reported that M.B. wanted stability in her life and was uncomfortable staying overnight with people who were unfamiliar to her. Dr. Fontenelle further indicated that M.B. is prone to symptoms of anxiety due to the uncertainty of her living arrangements. Dr. Fontenelle’s records state that M.B. reported previous domestic abuse, describing an incident where she witnessed an argument between her mother and father that resulted in her mother cutting her father with a machete. In her 2011 evaluation, M.B. reported that she was comfortable and secure living with her maternal aunt and uncle.
Dr. Fontenelle also evaluated K.B. in October of 2009 and November of 2011. Dr. Fontenelle found K.B. to be of average intelligence and diagnosed her with major depressive disorder, alcohol abuse by history, and pain disorder | (¡(physically and psychologically) by history.[7] Dr. Fonte-nelle reported that K.B. has the intelligence to obtain employment and support herself but that her depression could affect her ability to meet certain goals. Dr. Fontenelle testified that he saw no improvement in K.B. from her 2009 to 2011 evaluations and that K.B. has no direction or plan for her life. Dr. Fontenelle indicated that visitation with K.B. could be beneficial, but testified that if K.B. continued to demonstrate her inability to parent, visitation would be contraindicated.
*1241 Ms. McGary testified that KB. has not taken advantage of free mental health treatment and does not have a permanent home or stable living arrangement. Ms. McGary directed KB. to the Alpha Daughters of Zion Outreach Center for temporary shelter and counseling. Ms. Shirley Sims, the Executive Director of the center, testified that K.B. accepted money for gasoline and food but refused counseling and hastily left the center when asked to provide emergency contact information. Ms. Sims stated that K.B. does occasionally stop by the center for a “pat on the back” but still will not speak with anyone about her parenting concerns and does not accept counseling.
Ms. McGary testified that the risks of reunification with K.B. are instability, lack of housing and income, and chronic abuse or neglect. She also stated that, although K.B. has continued monthly visitation with M.B., she has not provided the $25.00 per month child support required by her case plan. She testified that she does not expect any improvement in KB.’s situation in the near future. M.B. has reported to DCFS that she is secure and happy with her maternal aunt and uncle in Louisiana and would like to remain in their home if possible. Ms. McGary testified that DCFS’s recommendation is for M.B. to be freed for adoption.
|7L.B., the maternal aunt with whom M.B. is placed, described M.B. as a happy child who likes to play and sing. L.B. testified that she would “absolutely” adopt M.B. and continue to ensure that she receive the appropriate care and mental health treatment needed. L.B. further testified that, although M.B. is more irrational and belligerent for a short period of time after phone calls and visitation with K.B., she would allow continued contact between K.B. and M.B. because M.B. wants to know that her mother is “okay.”

DISCUSSION

Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights. State ex rel. A.T., 06-0501 (La.7/6/06), 936 So.2d 79, 82. In a termination of parental rights proceeding, the law provides that a parent’s rights shall be terminated if the state proves at least one of the statutory grounds for termination of parental rights, as set forth in La. Ch.C. art. 1015, by clear and convincing evidence. State ex rel. D.D.M., 07-1017 (La.App. 5 Cir. 3/25/08), 983 So.2d 141, 145. The department need only establish one of the enumerated grounds for termination set forth in La. Ch.C. art. 1015. State in Interest of J.R., 11-351 (La.App. 5 Cir. 12/13/11), 84 So.3d 623, 628.
In addition, the trial judge must find that termination of the parent’s rights is in the best interest of the child. State ex rel. D.D.M., 07-1017 (La.App. 5 Cir. 3/25/08), 983 So.2d at 145. While parents have a fundamental liberty interest in maintaining a meaningful relationship with their children, the child has a profound interest, usually at odds with those of the parents, in terminating parental rights that inhibit secure, stable relationships found in a home with proper parental care. In balancing these two interests, the courts of this state have consistently found that the child’s interest is paramount. State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d 107; State in Interest of J.R., 11-351 (La.App. 5 Cir. 12/13/11), 84 So.3d at 628.
It is well-settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. State ex rel. A.T., 06-0501 (La.7/6/06), 936 So.2d at 82-83.
The grounds for termination of parental rights in this case are:
[[Image here]]
*1242 (3) Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
[[Image here]]
(i) Abuse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
[[Image here]]
(j) Abuse or neglect after the child is returned to the parent’s care and custody while under department supervision, when the child had previously been removed for his safety from the parent pursuant to a disposition judgment in a child in need of care proceeding.
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as nee-essary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La. Ch.C. art. 1015
|9La. Ch.C. art. 1015(3)(j) provides that termination of parental rights is proper when parental misconduct exists, which includes abuse[8] or neglect[9] “after the child is returned to the parent’s care and custody while under department supervision, when the child had previously been removed for his safety from the parent pursuant to a disposition judgment in a child in need of care proceeding.[10] ”
The legislature defined a neglected child in broad terms to enable experienced juvenile courts to apply their training and experience to the unique facts and circumstances of each case. State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 813 (citations omitted).
In this case, the record supports the trial court’s finding of parental misconduct and termination under La. Ch.C. art. 1015(3)(j). Within the month that K.B. obtained legal custody of M.B., she impulsively left Florida and relocated to Louisiana without a job or a place to permanently live. Dr. Fontenelle’s 2011 *1243 evaluation found no improvement in K.B.’s behavior and indicated that KB. had no direction or plan for her life. Ms. McGary testified that she did not anticipate any improvement in KB.’s situation in the near future. Although the testimony reflects that K.B. loves M.B., it is noteworthy that no individual, including K.B.’s family members, recommended reunification. K.B., for unknown reasons, has been unable to obtain employment or find a stable place to live. She has declined free mental health treatment despite a diagnosis of severe depression. The record reflects that the instability in M.B.’s life has resulted in a diagnosis of adjustment |indisorder of childhood secondary to family dysfunction and emotional abuse. Adults can take years to improve their functioning but developing children do not have such time, as children’s lives are significantly disrupted while their parents are attempting to deal with their own problems. State in Interest of J.R., 11-351 (La.App. 5 Cir. 12/13/11), 84 So.3d 623, 631; State in the Interest of C.D., 558 So.2d 806 (La.App. 5 Cir.1990).
Under the facts of this case, we cannot say that the trial court was clearly •wrong in its judgment terminating K.B.’s parental rights or in finding that termination is in M.B.’s best interest. Because we determine that the trial court was correct in its judgment terminating KB.’s parental rights under La. Ch.C. art. 1015(3)(j), we pretermit a discussion of the grounds for termination under La. Ch.C. art. 1015(3)(i) and (5). See State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d 107, 117.[11]
K.B. also complains to this Court that DCFS did not provide adequate reunification efforts after a new petition for adjudication was filed and asserts that DCFS should have been required to file a motion under La. Ch.C. art. 672.1 to have the trial court determine whether reunification efforts were required.
La. Ch.C. art. 672.1, however, is permissive and not mandatory. It provides that the department “may” file a motion for a judicial determination that efforts to reunify the child and parent are not required; however, Article 672.1 does not compel the department to file such a motion. State ex rel. R.L.T. & S.A.T., 45,168 (La.App. 2 Cir. 1/27/10), 30 So.3d 1085, 1089; State ex rel P.A.P., 44,221 (La.App. 2 Cir. 2/4/09), 4 So.3d 182; La. Ch.C. art. 672.1. Nevertheless, the record in | nthis case demonstrates that DCFS did in fact attempt reunification efforts. Subsequent to the new adjudication[12], at the October 18, 2010, January 13, 2011, May 12, 2011, and August 10, 2011, review hear *1244 ings, the trial court found that DCFS took reasonable efforts toward reunification in this case.[13]
“Reasonable efforts” means the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families. La. Ch. C. art. 603. “Reasonable efforts” does not require the department to provide rent-free housing to a parent; it does, however, require that when housing is an impediment to reunification, the department direct the parent to the appropriate agencies that may be able to assist in finding stable housing. State ex rel. A.T., 06-0501 (La.7/6/06), 936 So.2d 79, 86.
The record reflects that DCFS made reasonable efforts toward reunification for over two years before K.B. obtained legal custody of M.B. in August of 2011. The testimony presented shows that, after M.B. was again removed from KB.’s custody in October of 2011, DCFS directed K.B. to Alpha Daughters of Zion Outreach Center, where temporary shelter, food, gas money, and counseling were offered. However, Ms. Sims, the Director of the Center, testified that in order to apply for aid for permanent or stable housing, K.B. would have had to obtain a job, which she refused to do. Additionally, Ms. McGary testified that K.B. was provided brochures and information directing K.B. to properties that base rent on income. The testimony reflects that K.B. was provided but refused mental health 112treatment and consistently refused to work.[14] DCFS is a governmental agency with thousands of cases and finite resources that cannot support KB.’s apparent need for long-term assistance. See State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d at 116.
Our review of the record reflects that the trial court did not err in finding that DCFS made reasonable efforts toward reunification. KJB.’s argument lacks merit.

CONCLUSION

Accordingly, for the reasons above, we affirm the judgment of the trial court terminating KB.’s parental rights and freeing M.B. for adoption.

AFFIRMED

JOHNSON, J., concurs with reasons.

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules-Courts of Appeal, the initials of *1239 the minor and family members involved will be used to protect the child’s identity. State Dept. of Soc. Services, ex rel. S.S., 07-165 (La.App. 5 Cir. 9/25/07), 968 So.2d 199, 200.

. DCFS was previously named the Office of Community Services.

. The first case is docket no. 12133.

. The second case is docket no. 12715.

. The father’s rights were terminated pursuant to La. Ch.C. art. 1015(4) (abandonment). The father did not participate in the proceedings and has not appealed.

. The record reflects that K.B. has not had steady employment since 2003. K.B. did work for Chisesi’s Ham Company for two days and briefly worked, but was never paid, as a vacuum salesperson. The record indi *1240 cates K.B. worked occasionally while in Florida painting fences, but quit that job as she was not guaranteed full-time work and was dissatisfied with her $6.40 per hour wage for the work she performed.

. K.B. reported back pain secondary to multiple motor vehicle accidents.

. La. Ch.C. art. 1003(1), in pertinent part, defines abuse as:
[A]ny of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a) The infliction or attempted infliction, or, as a result of inadequate supervision, the allowance or toleration of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.

. La. Ch.C. art. 1003(10), in pertinent part, defines neglect as:
[T]he refusal or failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health and safety is substantially threatened or impaired.

.Further, the 1997 comments to La. Ch.C. art. 1015 specifically state that, in the situations provided for in 1015(3)(a) through (j), the risk to the child’s future safety is insup-portably high.

. In brief to this Court, DCFS asserts that termination of parental rights is required in this case under La. Ch.C. art. 1004.1, which provides that the Department shall seek termination of parental rights "if the child has been in state custody for seventeen of the last twenty-two months!.]” However, the record reflects that legal custody of M.B. was granted to K.B. from August 10, 2011 to October 11, 2011. Thus, we find La. Ch.C. art. 1004.1 is inapplicable to this case.

. Although a new adjudication was instituted, the trial court consolidated the two cases without objection. The record is clear that the two cases both involve the continued custody and care of M.B. and that the parties clearly intended to merge the two actions for the court's consideration. See Louviere v. Louviere, 01-0089 (La.App. 1 Cir. 6/5/02), 839 So.2d 57, 74, writ denied, 02-1848 (La. 10/25/02), 827 So.2d 1152 and writ denied, 02-1879 (La. 10/25/02), 827 So.2d 1151 and writ denied, 02-1878 (La. 10/25/02), 827 So.2d 1151 and writ denied, 02-1877 (La. 10/25/02), 827 So.2d 1150 and writ denied, 02-1868 (La. 10/25/02), 827 So.2d 1152; Voth v. American Home Assurance Company, 219 So.2d 236, 240 (La.App. 1 Cir.1969).

. The parties did not seek supervisory review of the trial court’s rulings finding that DCFS had made reasonable efforts toward reunification in this case.

. K.B. did testify at the termination hearing that she submitted applications on-line for employment but had not received any job offers.