FREDERICKA HOMBERG WICKER, Judge.
12Pefendant, J.R., appeals the termination of her parental rights by the Juvenile Court following a trial on the merits of a petition for termination of parental rights filed by the Department of Children and Family Services.[1] In this appeal, J.R. argues the trial court erred by finding: DCFS proved grounds to terminate J.R.’s parental rights; that DCFS made reason *362 able efforts to reunify J.R. with her son; and that terminating J.R.’s parental rights was in the best interest of her son, E.R. For the following reasons, we find J.R.’s assignments to be without merit and affirm the Juvenile Court’s judgment.

PROCEDURAL HISTORY

On October 29, 2012, DCFS filed a petition seeking to terminate J.R.’s parental rights over E.R.[2] On January 29, 2013, the Juvenile Court for the Parish of Jefferson held a trial on DCFS’s petition. At the conclusion of that trial, the court took the matter under advisement. On March 7, 2018, the court signed a written | ¡Judgment and issued extensive reasons for its judgment. The court’s judgment terminated J.R.’s parental rights and freed E.R. for adoption. Thereafter, J.R. timely filed a “notice of appeal.”[3]

OVERVIEW

The basic question presented in this case is whether the Juvenile Court erred when it granted the DCFS petition to terminate a mother’s parental rights when that mother, over a twenty month period, consistently complied with the detailed and complex court approved case plan, the goal of which was reuniting the mother and her baby boy; and where the evidence was clear and uncontroverted that the mother loved her child, and attempted wholeheartedly to do everything in her power to take all necessary steps to permit her to be reunited with her child.
Due to J.R.’s longstanding and undisputed mental health problems, the trial court found that E.R. was a child in need of care and approved a case plan with the goal of reunifying E.R. with J.R. E.R. was removed from his mother’s home on May 20, 2011 and placed with a foster family. By the time of the trial in this matter, E.R. had lived successfully with his foster family for twenty months.
Over that period, J.R. complied with all aspects of this case plan. She clearly loves E.R. and desires to live with him in a loving parent/child environment. J.R. worked with the ACT Team in mental health treatment, completed two Volunteers of America (“VOA”) parenting courses and worked with her DCFS case managers, with E.R. in a supervised setting multiple times per week for many months, and accepted feedback for improvement. In spite of this, this Court finds that the trial court did not err when it found that DCFS had proven by clear and convincing evidence that J.R.’s longstanding and significant psychotic | ¿history, ongoing mental illness, and significant cognitive impairment, render her unable to safely parent E.R.

FACTS

At trial, the court heard testimony from: Elaine Lee; Dr. Angela Breidenstine; Dr. Amy Dickson; Dr. Monica Stevens; E.R.’s foster mother, M.W.; Dr. Jose Rodriguez; Michelle Rossbach; Elaine Lane; J.R.; and her sister, B.R. Although J.R. was notified that she was required to attend this trial starting at 8:00 a.m., J.R. had not appeared in court when the court commenced the trial at 8:25 a.m.[4] J.R. did not enter the courtroom until 9:17 a.m.
*363 DCFS’s first witness against J.R. was Ms. Elaine Lee, the DCFS case manager for J.R. and E.R.’s cases. Ms. Lee testified that when E.R. came into DCFS’s care, DCFS developed a court-approved case plan to reunite E.R. and J.R.
As to J.R.’s ability to provide the necessary resources to parent E.R., Ms. Lee stated that J.R. has been able to establish appropriate housing for her and E.R. through the “Permanent Housing program.” Ms. Lee further testified however that J.R. has not had a job and that J.R.’s sole source of income is Social Security disability payments. Ms. Lee testified that J.R. receives about $674 in social security benefits per month and typically has food in her home.
As to J.R.’s parental interaction with E.R., Ms. Lee testified that when J.R. comes to visit E.R., she usually brings snacks and toys, and has, at least once, brought an outfit. J.R. complied with the visitation portion of her case plan and stayed in regular communication with DCFS. J.R. has made over 100 visits to E.R. Ms. Lee testified that J.R. currently makes three visits to E.R. each week, with each visit being an hour in duration. Ms. Lee or another worker supervise these visits by observing the interaction between J.R. and E.R. in a separate room | .¡through a two-way mirror. Ms. Lee stated that at the beginning of the implementation of J.R.’s plan, either she or another DCFS staff worker monitored every visit. In more recent exhibits however, Ms. Lee conceded that staff occasionally do not continuously watch J.R.’s interaction with E.R., rather, they stay close by.
DCFS recommended to J.R. that she undergo psychological evaluations and take certain parenting classes. J.R. complied by submitting to psychological evaluation and completed two sets of parenting classes. Even after this however, DCFS still had concerns about J.R.’s ability to safely and effectively parent E.R. on her own. Because of this concern, DCFS requested the Tulane University’s Infant Team evaluate J.R. The Infant Team thereafter evaluated J.R. over the course of a month or a month and a half. During this assessment, the Infant Team “watched her, supervised her, had her come into the office, [and] had her intermingling with [E.R.].” Thereafter, the Infant Team concluded that the risk of returning E.R. to his mother’s care is unacceptably high at this time. Ms. Lee testified that the Infant Team’s recommendation was based in part on the fact that J.R. is “over zealous” in her attention to E.R. and that J.R. sometimes doesn’t take her medications. Ms. Lee testified that while J.R. is currently on her medication, it’s impossible to know when J.R. will go off her meds and quickly become upset. Ms. Lee testified that DCFS agrees with this conclusion and recommends a permanent plan be implemented for E.R. at this point.
Ms. Lee testified that an additional basis for DCFS’s recommendation was that J.R. needed assistance through her ACT Team to bring her to all of her appointments, assist her with her medication, and with other things. Ms. Lee described this as problematic because if J.R. was awarded full-time custody of RE.R., ACT team could not be with J.R. 24 hours per day to assist her. Ms. Lee concluded that:
“[J.R.’s] mental capacity to raise a child may be questionable ... she does have a mental health issue and it has been noted several times. She’s been hospitalized several times. She has stated she’s forgotten to take her medication. She tried to commit suicide on at least three occasions: Hanging herself once, walking in front of a car after her mother passed away, and also another time when she tried to commit suicide.... *364 We’re talking about a mental health parent [sic] who has been hospitalized. Who has attempted suicide in the past. Who has stated before that she does not want to have this baby. Who has said the father [is] trying to give him up. Who has burnt her skin with a curling iron stating some other entity has told her to do that. It’s an issue. It’s an issue with the agency.
Ms. Lee then affirmed that DCFS’s position is based on J.R.’s mental health.
In response to a question about whether J.R. was the victim of domestic abuse, Ms. Lee answered negatively and stated, “I did see her with the scars, but bruises I did not. And she never told me that she was abused.”
When asked if there is any treatment that she thought could have made J.R. able to parent E.R., Ms. Lee responded “Not that I know. I really don’t know. They may have something, other sources that we haven’t tapped into. But, no, ma’am. No.” Ms. Lee opined that she is comfortable with J.R. visiting E.R. while under supervision, even if it was indirect with supervisors close by, but that she was cautious about letting J.R. visit E.R. outside of the office. Ms. Lee stated that before that happened; she would want J.R. to undergo a supervised home visit. In response to another question, Ms. Lee stated, “I have never seen her [J.R.] try to hurt her child. I never did see it. I never saw that.”
After testifying that E.R. gets along fine with his brother in his foster family and that E.R. calls M.W., his foster mother, “mommy,” Ms. Lee stated that DCFS recommended E.R. be freed for adoption at this time.
17Before the Infant Team got involved, J.R. was assessed by Dr. Michael Chafetz and Dr. Christine Powanda. Ms. Lee admitted that, because J.R.’s ACT Team is a direct support system, that she did not refer J.R. for direct support worker services. While DCFS did not provide J.R. with counseling, J.R.’s ACT Team did. Aside from seemingly minor issues with communicating with DCFS, Ms. Lee was satisfied with the ACT team’s service of J.R. In response to a question of whether there was any entity working with both J.R. and E.R., Ms. Lee answered that the VOA did through various parenting classes, and that she was happy with the VOA’s progress. When asked if she was satisfied with J.R.’s parental training, Ms. Lee responded, “I’m satisfied with what she has done. But she still has issues, underlying issues.” J.R.’s interaction with VOA ended in May of 2012. Ms. Lee testified that J.R. could have benefited from an in-home supervised parent training with E.R. that lasted for a “number of hours.” Ms. Lee stated she contacted various entities that provide social services, and none of them provide this type of service.
Dr. Angela Breidenstine, a clinical psychologist and assistant Tulane University professor who served on the Tulane Infant Team, testified as an expert in the area of clinical psychology.[5] Dr. Breidenstine testified that the Infant Team is an infant early childhood mental health program which is a consultant agency to DCFS. The Team works with children who come into care before the age of five in Jefferson Parish doing assessments with the children, their biological parent, and foster parents.
Dr. Breidenstine confirmed the Infant Team was contacted in June of 2011 about taking on this case as a referral, but it declined the referral as it was not accept *365 ing cases at that time. Later, in June of 2012, DCFS contacted the team |8again, this time requesting the Infant Team evaluate J.R.’s parenting ability. The Infant Team performed this evaluation. The Infant Team did not however commit to this case as an “intervention case.” The Infant Team met with J.R. multiple times and conducted “over seven and half hours of either face-to-face interviews or observations of her with her son during the course of the evaluation.” Additionally, the Infant Team spent multiple hours contacting collateral providers to obtain updates on her functioning from them and also reviewing records.
J.R. attended her appointments with the Infant Team and completed her assessment. Dr. Breidenstine testified that she and the rest of the Infant Team “had a number of impressions from our evaluation with her.” First, it was clear J.R. desired ■ to parent E.R. However, the Infant Team was concerned with J.R.’s:
long standing chronic history of major mental illness. She’s received multiple diagnoses including schizophrenia, schi-zoaffective disorder, bipolar disorder, major depression with psychotic features, trichotillomania. All of these are basically describing symptoms of psychosis and major mood disturbances.
At the time that we evaluated her, and I believe she was not in full understanding of her mental health problems, she was not fully understanding of her need for treatment. She had a history of at time[s] not complying with her mental health treatment and having lapses in her medication including serious hallu-cinic [sic] commands, hallucinations, actions of [self] harm, actions of potentially harming [E.R.] when he was an infant. So she had ... very serious mental health conditions that she does not fully understand.
Dr. Breidenstine further opined that J.R. has significant difficulty maintaining focus and shifting her focus when necessary. J.R. became distracted for multiple minutes at a time. On multiple occasions, E.R. engaged in behaviors that were potentially harmful without J.R. noticing. Dr. Breidenstine described a time when E.R. walked to the visit room’s door and opened it. In response, J.R. “glanced at him and walked to the other side of the room and looked out, the window for at least a minute as [E.R.] stood at the door and looked at her back.” 18J.R. called for E.R. to come, but then did not attend to E.R. for at least a minute, during which time E.R. could have easily left the room. At another time, when J.R. and E.R. were in a waiting room, the Infant Team observed J.R. put her back to E.R. and allow E.R. to rummage through her purse for “a good five minutes” without attending to him.
Dr. Breidenstine also testified that during one visit, E.R. was observed “pulling a plastic garbage bag over his head that had toys inside, and [J.R.] was sitting next to him but was engrossed in looking at a toy herself and did not notice him putting the bag over his head.” She also testified that when J.R. was pressed to talk about a routine and caring for E.R., “she said she would feed him breakfast and lunch and she didn’t mention feeding him dinner [or] ... snacks.”
On J.R.’s knowledge of parenting, Dr. Breidenstine stated that although J.R. made progress, J.R. still has deficits. Dr. Breidenstine testified:
[J.R.] said that she would want him to sleep five to six hours a night and that— while she knows naps are good, if he wanted to stay up and be with her, she would allow him to do so.... We observed her also to interact with him not always appropriately for his develop *366 mental level.... she seems to expect him to monitor himself in ways that a two year old cannot be expected to do_So she has-some limitations in her understanding of him as a toddler.
J.R. also unrealistically denied that anything about caring for E.R. could be challenging or would ever be challenging in the future. J.R. inconsistently applied rules to E.R., at times allowing him to sit on a windowsill then, several minutes later, chastising him when he had climbed up to the windowsill himself.
Dr. Breidenstine opined that J.R. has made less progress than she expected given J.R.’s classes with the VOA. J.R. indicated to Dr. Breidenstine in August of 2012 that she would like to move with E.R. to Texas in order to live with R.W., E.R.’s alleged father. According to Dr. Breiden-stine, J.R. believed that she would not require any support from her ACT Team other than their shipping medications | into her. Dr. Breidenstine opined that J.R. did not have insight on her own mental health needs.
Further, J.R.’s psychological evaluation showed low cognitive abilities and low levels of social support. Dr. Breidenstine also testified that she reviewed Dr. Rodriguez’s report indicating that J.R. had a “global assessment of functioning” score of 38. Dr. Breidenstine opined that this score “indicates impairment in reality testing, in communication, or major impairment in several areas of daily functioning such as work or family life, social relationships.” This score also indicates J.R. requires extensive mental health support services. Dr. Breidenstine opined that J.R. did not understand her diagnosis and that J.R. is still exhibiting symptoms that would be concerning regarding her ability to safely and effectively parent E.R. Dr. Breidenstine opined that J.R.’s “unrealistic parenting expectations coupled with her strong need for [E.R.] to satisfy [her] emotional needs ... are also a risk.”
The Infant Team also observed E.R. with his foster parent, M.W. Dr. Breiden-stine opined that given everything she knows about this case and J.R., that there is nothing that can be done that would allow J.R. to safely and effectively parent E.R. independently in the foreseeable future. Dr. Breidenstine concurred with the Infant Team’s belief that it is in E.R.’s best interest to implement a permanent plan for him at this time.
On cross examination by E.R.’s appointed attorney, Dr. Breidenstine testified again that E.R. would likely be at risk of harm if J.R. were allowed to care for him without supervision. Dr. Breidenstine was also concerned about J.R.’s “propensity to psychosis especially when under stress.” This in itself is concerning because J.R. “does not anticipate that parenting would be stressful.” The risk of J.R. harming E.R. when she is under stress is greater than it would be for another |nparent under the same stress. When asked if additional parenting courses would be helpful for J.R., Dr. Breidenstine responded that while she thought that every parent can benefit from parenting interventions, that she did not think that such interventions “would be sufficient to remediate the mental health issues that are underlying these problems at least not in any foreseeable future that would be appropriate for [E.R.] unfortunately.”
Next, J.R. called Dr. Amy Dickson as an expert witness in the field of clinical psychology. Dr. Dickson testified that she is the director of the Orleans Parish Infant Team. Dr. Dickson explained that she was asked to review J.R. and E.R.’s records to see if she thought J.R. would benefit from servicing and if such servicing would allow her a relationship with E.R. Dr. Dickson *367 reviewed the medical records in this case and had, the previous day, conducted an in-person evaluation of J.R. while J.R. interacted with E.R. Dr. Dickson’s in-person evaluation of J.R. lasted two hours. Dr. Dickson observed J.R.’s interaction with E.R. for forty five minutes to an hour of that time.
Dr. Dickson testified that when E.R. first saw J.R. during this visit, he called out “momma, momma.” Although he was nervous at first, once E.R. was alone in a room with J.R., “he relaxed, smiled often, [and] communicated well with her. He oriented towards her pretty much the entire time they were together. They had mutually enjoyable play that was developmentally appropriate. [J.R.] was very responsive to his needs in that sort of structured setting.”
When it was time for him to leave, ... she carried him and helped him back to the van, he ... didn’t want to be buckled back in and reached for her and wanted to remain with her. She was very gentle with him and was able to get him buckled into his car seat and they were able to go.
Dr. Dickson opined that she did not see anything that caused concern during this interaction. J.R. was not overly emotional. She was affectionate |12with E.R., but it was not constant. J.R. allowed E.R. autonomy to explore. J.R. wiped E.R.’s face on two occasions, but Dr. Dickson did not find this wiping intrusive.
In regards to the incident of J.R. leaving E.R. in the bathtub, Dr. Dickson opined that based on J.R.’s tested I.Q. level, that she may have not thought it unsafe to leave E.R. in the tub because another adult, the therapist, was in the room.
Dr. Dickson opined in conclusion that “it’s clear that [E.R.] loves his mother and has some connection to her and feels bonded to her.” “My greatest concern for her is that she continues her psychiatric treatment.” Dr. Dickson believed that it would have been better if the Infant Team, rather than the ACT Team, had provided the intense psychiatric services to J.R. This would have allowed J.R. to have “intensive” child parent psychotherapy services with her son. Dr. Dickson opined that based on her one interaction and her review of the record, that she could give a “guarded recommendation.” Dr. Dickson testified that J.R. had completed her plan to the best of her ability. She further testified that she felt it “would be nice if she got some intensive services and that there was a trial to see how she’s doing. ... [J.R.] does have a psychiatric history, but I don’t know that we know for sure that that means she cannot parent her child at this time.” Dr. Dickson testified that J.R. had improved, her behavior during her visit was different from the previous reported history from when she was younger and J.R. was better able to articulate E.R.’s needs.
On cross examination by DCFS’s attorney, Dr. Dickson agreed with Dr. Breiden-stine’s testimony on the meaning of a GAF score of 38. On J.R.’s perception of her mental health needs, Dr. Dickson stated that it would concern her “if [J.R.] doesn’t think she has any psychiatric diagnosis, but that’s not what she 1^stated to me on the one occasion that I saw her.” While J.R. does not trust the ACT Team, it is a helpful sign that this distrust does not stop J.R. from accepting and taking the medication given to her by the ACT Team. Dr. Dickson testified that if she were to treat J.R., she would likely be able to tell within three months whether J.R. could safely parent E.R. Dr. Dickson admitted that had she begun evaluating J.R. earlier, she would have been better able to reach a conclusion as to whether J.R. could safely and effectively parent E.R. Dr. Dickson *368 explained that it was her schedule, not J.R., which prevented her from evaluating J.R. earlier.
;Dr. Monica Stevens testified next as an expert in clinical psychology. Dr. Stevens testified that she worked with the Infant Team and that she was the Team’s primary evaluator of J.R. Dr. Stevens testified that she had heard Dr. Breidenstine’s testimony, that Dr. Breidenstine’s testimony was a thorough assessment, and that she agreed with it.
As to what she witnessed, Dr. Stevens testified that J.R. was “very committed in working her case plan” and that “it is very apparent that [J.R.] cares for [E.R.].” Dr. Stevens testified that the Infant Team completed a parent-child interaction procedure called the “Krull procedure.” This assessed the interaction between J.R. and E.R. Not counting the time spent reviewing J.R.’s records, this assessment took seven and a half hours. The most recent visit between J.R. and E.R. she observed was on January 16, 2013. Dr. Stevens testified that there is an attachment between J.R. and E.R., and that, in a structured setting, J.R. was able to engage E.R. in a variety of tasks. Dr. Stevens testified that she performed the same procedure with E.R. and his foster mother, M.W. Based on this assessment, Dr. Stevens opined that the attachment between M.W. and E.R. was more secure than J.R.’s connection to E.R. Dr. Stevens believed that “after spending 20 months in [M.W.’s] home, [E.R.] established a strong attachment to her.” Dr. Stevens was 1 Mconcerned that stress in J.R.’s life could significantly disrupt her stability and ability to maintain normal functioning.
On cross examination by E.R.’s attorney, Dr. Stevens testified that during her January observation of J.R., she did not witness anything “grossly neglectful” such as when she observed J.R. allowing E.R. to put a bag over his head. While J.R. was slightly better able to attend to E.R. than in previous observations, J.R. still exhibited “the pattern of intrusive, overly directive behavior.”
Furthermore, J.R. still had unrealistic developmental expectations of E.R. Dr. Stevens testified that when J.R. asked E.R. whether he was ready to “come home,” E.R. answered “no.”
Dr. Stevens agreed with Dr. Breiden-stine’s assessment that there are not services available to adequately remediate J.R.’s issues. She also confirmed that E.R. faced an increased risk of harm if returned to J.R. due to the “cluster of symptoms that come along with her complicated psychiatric status [which] impair her ability to safely monitor him.” These are the same problems that existed when E.R. came into care. On cross examination by J.R.’s attorney, Dr. Stevens testified that the risk of harm is too great to safely transfer E.R. to J.R., even if the transfer was done slowly.
E.R.’s' foster mother, M.W., testified next. M.W. told the court that E.R. came into her care when he was eight months old on May 20, 2010. When he came into her care, E.R. was a withdrawn and fearful child. M.W. testified that, at the beginning, E.R. could not be left alone without becoming hysterical and that he had difficulty sleeping. When E.R. would return from a visit with J.R., E.R. would cling to her. M.W. testified that now, E.R. is able to distinguish between time he may enjoy with J.R., and time with M.W. M.W. described E.R., stating:
| isl’ve seen him grow and become secure in himself, become a happy little toddler .... He surprises me every day because of how bright he is.... I mean, he’s just — to me, he’s a miracle child. He’s ... a little man of his own world.
*369 M.W. affirmed that if E.R. were freed for adoption that she is committed to adopting him. M.W. testified that her main concern for E.R. is that he be allowed to grow in a secure environment. On cross examination by J.R.’s attorney, M.W. testified that while M.W. had not had any experience-with children of E.R.’s age, she obtained information about children of that age through her employment at a college, through an early childhood development program, and through a pediatrician.
Dr. Jose Rodriguez, J.R.’s treating psychologist testified next. Dr. Rodriguez testified that he works with Family Pres-ervations Services providing an “ACT Service,” which is an assertive community treatment program. Dr. Rodriguez stated J.R. has been under his care for approximately 20 months, seeing J.R. about once a month since August of 2011. Dr. Rodriguez further testified that, recently, J.R.’s psychiatric condition has been less severe. The last time that J.R. was not stable was in January of 2012. Dr. Rodriguez did not have any concerns with J.R.’s mental health treatment. J.R.’s medicine has- not been changed recently.- Dr. Rodriguez stated that J.R.’s problem with picking at her face had improved and that J.R. had no other issues that were brought to his attention by DCFS that he did not treat.
Dr. Rodriguez stated that J.R. was originally diagnosed with psychosis, which was probably schizophrenia, but has a new diagnosis for major depression. Dr. Rodriguez confirmed that he diagnosed J.R. with schizophrenia paranoid type and depressive disorder when J.R. first came into his care based on previous reports of J.R.’s treatment. On cross examination by DCFS’s attorney, Dr. 11fiRodriguez told the court that he had changed J.R.’s diagnosis because there were certain symptoms that were more present that showed a mood component than the psychiatric psychosis component. Dr. Rodriguez stated he did not see many schizophrenia symptoms in J.R. during his treatment of her. Dr. Rodriguez opined that J.R.’s earlier diagnosis may have been influenced by her substance abuse.
Dr. Rodriguez did not have concerns about J.R.’s mental' health and has not seen any signs that J.R. might hurt herself dr her baby within the last year. When asked what- incident caused E.R. to be placed in care, Dr. Rodriguez responded that an ACT Team nurse had reported that J.R.’s medications were accessible to E.R. Dr. Rodriguez told the court that the ACT Team addressed this issue with J.R., and that J.R. now keeps her medications in a lock box. Later, on cross examination by E.R.’s attorney, Dr. Rodriguez testified that he had observed a visit by E.R. to J.R. and that during this visitation he did not see any signs that J.R. could not parent E.R.
Dr. Rodriguez testified that the ACT Team is committed to working with J.R. The ACT Team provides therapy and nurses. The ACT Team interacts with J.R. by giving her support to achieve her goals, such as obtaining a GED and a driver’s license. When asked whether the ACT Team would continue to support J.R. if E.R. was returned to her, Dr. Rodriguez testified, ‘Tes. We’d be more than happy to provide any services that she needed as far as any type of other things that she might need as far as, like, if she needs a ride somewhere or if she needs some other type of therapy or what not.” Dr. Rodriguez stated that the ACT Team checks on J.R. two to three times a week, but that they were willing to increase the frequency of these checks to insure a transition was made smoothly. The ACT Team would do their best and “look into whatever it is we needed to make her situation better.” On *370 cross examination by DCFS’s attorney however, Dr. | ^Rodriguez could not say specifically what sort of day-to-day services the ACT Team could provide J.R. to help her care for E.R., but that the ACT Team would be happy to engage in that type of activity for her. Dr. Rodriguez acknowledged that a hallmark of J.R.’s treatment was her lack of social support. He also acknowledged that her GAF of 38 put her on the severe side of low end functioning. This means that she will need on going ACT Team services.
When questioned about how the ACT Team would know if J.R. was not taking her medications, Dr. Rodriguez testified that the ACT Team would see a change in J.R.’s symptoms before they realized that J.R. had not been taking her medications. Dr. Rodriguez also stated that he was unaware that as recently as the previous day, J.R. had requested a new therapist. In response to questioning by the court, Dr. Rodriguez testified that medications are important to J.R., and that he prescribes J.R. Seroquel and Fluoxetine to treat her mood disorder and -psychosis. When asked if J.R. was not actively psychotic at this time due to her prescribed medicine, Dr. Rodriguez stated that since starting these medications, J.R. seemed to balance out and tone down her agitation and sensitivity to everything. Dr. Rodriguez testified that he checks whether J.R. is taking her medication and that he and J.R. talk about the importance of her medication. Because of these conversations and his observations, Dr., Rodriguez believes J.R. has been largely compliant with her medication regime for the past year. Dr. Rodriguez stated that the Fluoxetine also helps to treat J.R.’s compulsive face picking.
Michelle Rassbach, a nurse on J.R.’s ACT Team, testified next. Ms. Rassbach stated that J.R. has shown improvement over the course of her interaction with the ACT Team that has increased her independence. When questioned about additional services the ACT Team could provide should J.R. be reunited with E.R., Ms. Rassbach stated that the ACT Team could see J.R. four [18times a week or more if that was necessary. Ms. Rassbach testified that the ACT Team would help J.R. find community resources, counseling services, vocational support, or anything else J.R. needed. Ms. Rassbach testified that she visited with J.R. and E.R. during the previous week and that this visit went well. Ms. Rassbach testified that she did not have any concerns about J.R.’s ability to parent E.R.
On cross examination by DCFS’s attorney, Ms. Rassbach testified that J.R. had not expressed to her any concerns about her ACT Team therapist. When pressed on what type of support services the ACT Team could provide J.R., Ms. Rassbach responded that, in the past, the ACT Team had done parenting education. Wben asked if there was any point in the last year when J.R. had been in a crisis, Ms. Rassbach -testified that there was a day when J.R. did not take her medication because she had run out and that this had caused J.R. to continually call the ACT Team seeking more medication. Missing her medication for that day caused J.R. to be stressed and unable to sleep.
Ms. Elaine Lane, a facilitator for the Parenting Nurturing program at the VOA, testified next. Ms. Lane testified that she came to know J.R. through her facilitating a parenting education class. This class ran approximately 16 weeks from August of 2011 until November of 2011. J.R. attended the vast majority of the class’s sessions. While J.R. did not appear to be learning in the beginning, by the end, J.R. was learning. Furthermore, J.R.’s interaction with her son improved during this *371 time. In addition to these classes, Ms. Lane encountered J.R. in one-on-one sessions beginning in February of 2012 and ending May 23, 2012. During this time Ms. Lane served J.R. with ten hour-long sessions. Ms. Lane testified that J.R. showed improvement through these sessions. In the first few sessions, Ms. Lane testified that she was concerned by J.R.’s covering of her face and eyes with her scarf and sunglasses. However, by the time of J.R.’s sixth visit with Ms. Lane 11flwhen E.R. was joining in on the visit, J.R. agreed to remove these coverings from her face. Ms. Lane testified that J.R. improved her parenting by following specific instructions, such as to get covers for wall power outlets.
However, in February of 2011, during one of these sessions, J.R. indicated that, despite her medications, she still had auditory hallucinations. J.R. told Ms. Lane that she heard voices telling her that she was not worthy and that while the voices did not tell her to harm her child, the voices did tell her that E.R. did not love her. J.R. told Ms. Lane however, that she knew E.R. loved her. In response to questioning by the court, Ms. Lane clarified that the last time J.R. reported auditory hallucinations to her was during her session on March 29, 2012.
Ms. Lane’s final recommendation after J.R. completed the Nurturing Parent group sessions was that E.R. be returned to J.R. with close observation to ensure J.R. followed through on what she had learned in her sessions. Ms. Lane also recommended visiting coaching for J.R. and E.R., but stated that her office did not provide that service. In response to further questioning, Ms. Lane testified that if E.R. were returned to J.R. that she “would still have to recommend that she be monitored with the child for a period of time.” Ms. Lane also stated that J.R. could have gained more from some type of treatment by the ACT Team, her agency, or visiting coaching.
On cross examination by DCFS’s attorney, Ms. Lane stated that the last time she saw J.R. was in May of 2012. She testified that even on medication, J.R. continued to experience hallucinations, a recurring demonic voice instructing her to do harmful things to herself. She also expressed concerns with J.R.’s overwhelming E.R. with hugs and kisses; that behavior improved over time. After her 16 sessions on parenting, J.R. improved significantly on her “post-test.” Certain instances of these group sessions also included both J.R. and E.R.
lapNext, B.R. testified that she is J.R.’s 23 year old sister, that she attends school online, and that she lives with their grandmother in New Orleans. B.R. stated that she was close with J.R. and that she would be there to provide J.R. any support she needed should J.R. be reunited with E.R. B.R. stated she could provide J.R. with transportation and make sure she was on her medication. B.R. opined that J.R. had improved considerably and was focused on getting her son back. On cross examination, B.R. conceded that she had been in school and in New Orleans when E.R. was first placed in protective care.
J.R. testified as the last witness. J.R. told the court that since E.R. had been in care, she had learned a lot, become calmer, and more alert. J.R. also testified that she intended to continue working with the ACT Team and taking her medication. J.R. explained that she thought her auditory hallucinations were due to an interaction between her prescription medications. J.R. also stated she had not heard any auditory hallucinations within the last year and that she is capable of taking care of her son. J.R. testified that she cares for and teaches E.R. Reflecting on her *372 growth, J.R. stated that at first the criticisms of her parenting were hard on her, but that she has come to understand that she needs to improve.
. J.R. testified that she lives in her own apartment, that she has room there for E.R., and that she plans to purchase a bed for E.R. that she has put on layaway. J.R. then explained to the court that she had changed since the time that her son was taken away and asked the court to give her back her son. J.R. further testified that, to have her son back, she would comply with any court-ordered interventions. Regarding her mental health history, J.R. acknowledged it was bad, but stated that due to her current medication, she now feels much better than she had.
On cross examination by DCFS’s attorney, J.R. stated that if the ACT Team was not able to provide her with support, that she would seek support from her | ¡^family. When asked why E.R. was first taken away from her, J.R. responded that it was because she had left E.R. in the bathroom when a case worker was in the doorway watching him. J.R. also clarified that she did not want a new therapist. Rather, she wanted to stay with Dr. Rodriguez but have a new treatment team. In response to questioning by the court, J.R. explained that she would like to move forward with a new treatment team because she did not trust her current team and she was dissatisfied with their performance. J.R. however reiterated that she will not leave her treatment team if it cannot be replaced.
This matter was submitted after J.R.’s testimony. The court then asked Ms. Robinson, a representative from the Court Appointed Special Advocates (“CASA”) group, to make a recommendation. Ms. Robinson described M.W.’s house to the court as a very nurturing place. Ms. Robinson also stated that M.W. actively researched ways to be a better foster parent. On the issue of E.R.’s bond, Ms. Robinson stated that E.R. had an incredibly intense bond with M.W. and the two other boys in the foster home. Based on these observations, Ms. Robinson recommended that E.R. be released for adoption.
The court then took the matter under advisement.[6] On March 7, 2013, the court issued its judgment terminating J.R.’s parental rights, with extensive reasons for judgment.

DISCUSSION

Assignments One and Three

In her first and third assignments of error, J.R. claims the trial court erred by finding DCFS proved grounds necessary to terminate J.R.’s parental rights. J.R. argues that the evidence did not prove every element necessary under La. Ch. C. 122art. 1015(5) to terminate J.R.’s parental rights and that the termination of her parental rights was not in E.R.’s best interest. In response, DCFS concedes that J.R. worked through her case plan, but argues that the necessary elements to terminate J.R.’s parental rights remain because J.R. continues to pose a risk to E.R.
As previously explained by this Court:
Title X of the Louisiana Children’s Code governs the involuntary termination of parental rights. State ex rel. A.T., 06-0501 (La.7/6/06), 936 So.2d 79, 82. In a termination of parental rights proceeding, the law provides that a parent’s rights shall be terminated if the state proves at least one of the statutory grounds for termination of parental *373 rights, as set forth in La. Ch.C. art. 1015, by clear and convincing evidence. State ex rel. D.D.M., 07-1017 (La.App. 5 Cir. 3/25/08), 983 So.2d 141, 145. The department need only establish one of the enumerated grounds for termination set forth in La. Ch.C. art. 1015. State in Interest of J.R., 11-351 (La.App. 5 Cir. 12/13/11), 84 So.3d 623, 628.
In addition, the trial judge must find that termination of the parent’s rights is in the best interest of the child. State ex rel. D.D.M., 07-1017 (La.App. 5 Cir. 3/25/08), 983 So.2d at 145. While parents have a fundamental liberty interest in maintaining a meaningful relationship with their children, the child has a profound interest, usually at odds with those of the parents, in terminating parental rights that inhibit secure, stable relationships found in a home with proper parental care. In balancing these two interests, the courts of this state have consistently found that the child’s interest is paramount. State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d 107; State in Interest of J.R., 11-351 (La.App. 5 Cir. 12/13/11), 84 So.3d at 628.
It is well-settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong. State ex rel. A.T., 06-0501 (La.7/6/06), 936 So.2d at 82-83.
State in Interest of M.B., 12-547, p. 7-8 (La.App. 5 Cir. 1/30/13), 108 So.3d 1237, 1241.
In its petition seeking to terminate J.R.’s parental rights, DCFS alleged termination of J.R.’s parental rights is required under La. Ch.C. art. 1015(5). In relevant part, that article provides for the termination of a parent’s rights as follows:
I^The grounds for termination of parental rights are:
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La. Ch.C. art. 1015(5).
On the conditions required to prove this element, the Children’s Code, in relevant part, provides that:
Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
*374 (6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
La. Ch. C. art. 1086(C).
In this case, the first element, requiring a year or more to elapse since the child was removed from the parent’s custody pursuant to a court order is clearly established in the record. E.R. came into the DCFS’s custody on May 20, 2011 l^and the trial court issued- its judgment terminating J.R.’s parental rights and freeing E.R. for adoption on March 7, 2013.
The second element for termination of parental rights under La. Ch.C. art. 1015(5) requires DCFS to prove that “there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child.” Here, the record establishes that the court approved a case plan which sought to reunify E.R. and J.R. The record further establishes that J.R. made every effort to comply with this case plan. Despite this effort, expert evidence offered by the Infant Team members proved that J.R.’s significant mental health issues persist.
The Louisiana Supreme Court first addressed this issue before the enactment of the current law in State in Interest of L.L.Z. v. M.Y.S., 620 So.2d 1309, 1317 (La.1993), where it stated that “a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated.”
The Court clarified this test in State in Interest of S.M., 98-922, p. 14 (La.10/20/98), 719 So.2d 445, 452 stating that a court must ask whether a parent had "demonstrated that the behavior that led to the adjudication of dependency has been eliminated or significantly reduced, such that her ... [the] children are no longer at risk.” In State in Interest of S.M., the parent made progress pursuant to her reunification plan. She had obtained employment, earned a graduate equivalency diploma (GED), and completed both a parenting education course and a battered women’s program. Id. at 449. However, expert testimony in the record also recommended against the parent’s reunification with her children given the parent’s immature thinking process, concern that she could not parent her children, and need for continued individualized psychotherapy. Id. at 451. The Court found Lathe lower court erred in focusing on the parent’s cooperation with her reunification plan rather than assessing “whether [the parent] exhibited significant improvement in the particulars that had caused the State to remove her children from her care and custody.” Id. at 451. The Court found that there was no evidence in the record which could justify a finding that there was an expectation of the parent’s reformation in the foreseeable future and ordered that a new permanent plan for the children be considered.
Here, the record reflects that J.R. benefited from her parenting interventions and grew in her ability to care for E.R. However, on the issue of whether J.R. eliminated or substantially reduced the risk she posed to E.R. through her reunification plan, the court heard competing testimony. At trial, Dr. Stevens and Dr. Breidenstine, testified that J.R. would post a risk to E.R. if they were reunited. Additionally, Ms. Lee testified that based on her experience as the case worker in this matter, she concurred with DCFS’s recommendation that E.R. be freed for adoption. Furthermore, J.R.’s own expert, Dr. Dickson did not *375 explicitly recommend reunification, rather, Dr. Dickson recommended only more observation and more intensive therapy.
In support of reunification, the court heard testimony from: J.R. herself; her sister, B.R.; and the VOA facilitator, Ms. Lane. The court also heard testimony from Ms. Rassbach, a nurse with J.R.’s ACT Team, who testified that she did not have any concerns about J.R.’s ability to parent E.R.
We recognize J.R. made commendable progress in treating her mental health issues and learning what it takes to safely and effectively parent a child. However, based on our review of the record, we find that the trial court reasonably weighed these competing witnesses and did not manifestly err in determining that J.R. failed |;>fito substantially comply with her reunification plan because she did not eliminate or significantly reduce the risk she posed to E.R.[7]
The third element La. Ch.C. art. 1015(5) requires DCFS to prove that “despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.” Regarding the conditions that serve as proof of this element, the Children’s Code states that:
Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1)Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
La. Ch. C. art. 1036(D).
In support of her argument on this element, J.R. points to the testimony of Dr. Dickson, Dr. Rodriguez, and Elaine Lee. We address each of these witnesses in turn.
J.R. first points to Dr. Dickson’s testimony that J.R. should be given the opportunity to participate in intensive therapy and in-home supervised visits. Dr. Dickson opined that, given that she had only examined J.R. the previous day, she | i>7would have to treat J.R. for up to three months to make a conclusion as to her potential parenting ability. Dr. Dickson never stated that there was a reasonable possibility that J.R. could make the improvements required of her.
Dr. Rodriquez stated that J.R. is engaging in treatment and has been stable lately. Dr. Rodriquez also testified that, within the past year, J.R. had not exhibited signs causing him to be concerned that *376 J.R. would cause harm to herself or others. He recommended however that J.R. continue treatment with her ACT Team. Dr. Rodriquez did not explicitly recommend that J.R. be reunited with E.R.
Ms. Lane testified that J.R. successfully completed her parenting course with the VOA in part because J.R. demonstrated improvement on the course’s post-test. However, this testimony is contradicted by Dr. Breidenstine who testified that J.R. made less progress in- her courses with the VOA than she expected she should have.
Of particular relevance to this appeal, the state presented evidence in the form of the testimony of Ms. Lee, Dr. Breiden-stine, and Dr. Stevens. Ms. Lee testified that she believed that based on J.R.’s mental condition, J.R. should not be reunited with E.R. Dr. Breidenstine specifically opined that E.R. would likely be at risk of harm if J.R. were allowed to care for him without supervision. Dr. Breidenstine concurred with the Infant Team’s recommendation against reunification. Finally, Dr. Stevens testified that there is no available treatment that could allow J.R. to safely and effectively parent E.R. in the foreseeable future.
In her argument to this court, J.R. concedes that this is a matter with “dueling experts.” Based on our review of the record, we cannot find that the trial court manifestly erred when it found that DCFS has proved this element.
 | ^Finally, in addition to proving the above elements, the court may only terminate J.R.’s parental rights to E.R. if it is E.R.’s best interest. As explained by the Louisiana Supreme Court,
The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated.
State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811.
A review of the court’s reasons for judgment shows that the court considered the recommendation of the CASA representative and carefully considered each witness’s testimony.[8] Our review of the record convinces us that the juvenile court thoughtfully and reasonably considered E.R.’s best interest in its decision. Accordingly, we find J.R.’s first and third assignments to be without merit. Assignment Two
In her second assignment of error, J.R. argues the trial court erred in its judgment because DCFS failed to make reasonable efforts to reunify her with her son. In State ex rel. A.T., the Louisiana Supreme Court explained the requirement that DCFS make “reasonable efforts” at reunification, stating,
Pursuant to the Adoptions and Safe Families Act of 1997, 42 U.S.C.A. § 601, et seq., states are mandated to establish “permanency plans” for children , within the foster care system. State ex rel. J.M., 02-2089 (La.1/28/03), 837 So.2d 1247, 1256. The Act provides that such plans must demonstrate that the State *377 make reasonable efforts to “preserve and reunify” the family. Id. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. Id.
|2;)Accordingly, the Louisiana Children’s Code provides that, except in extraordinary circumstances as set out in La. Ch. C. art. 672.14, the State must undertake reasonable efforts to assist the parent in removing the obstacles to reunification. For instance, at the first stage of the process, “[t]he court shall immediately determine whether reasonable efforts have been made by the department to prevent or eliminate the need for the child’s removal ...” before granting an instanter order taking the child into state custody. La. Ch. C. art. 619(B). Further, at the hearing for continued custody, [ ... ] “the court shall determine whether the department has made reasonable efforts as defined in Art. 603(17) to prevent or eliminate the need for removal of the child from his home, and after removal, to make it possible for the child to safely return home.” La. Ch. C. art. 626(B). “Reasonable efforts” are defined by La. Ch. C. art. 603(17) as “the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families.”
06-0501, p. 6-8 (La.7/6/06), 936 So.2d 79, 83-84.
Here, the record establishes that J.R. was provided a variety of treatments and supports to aid her in reunifying with her child. J.R. received support from her ACT Team approximately three times a week. J.R. attended both group and individual sessions to teach her parenting skills with the VO A. Through her interactions with DCFS workers, J.R. was both monitored and instructed on better parenting techniques. J.R. was also able to obtain her own housing. Furthermore, her evaluation by the Infant Team provided her insight into her mental health condition.
At trial, Dr. Rodriguez testified that he did not have concerns about J.R.’s mental health treatment. Additionally, both Dr. Breidenstine and Dr. Stevens testified that no intervention could remediate J.R.’s underlying problematic mental health issue.
DCFS is a governmental agency with thousands of cases and finite resources that cannot support J.R.’s apparent need for long-term assistance. See State ex rel. C.J.K., 00-2375 (La.11/28/00), 774 So.2d at 116. Our review of the record reflects | anthat the trial court did not manifestly err in finding that DCFS made reasonable efforts toward reunification. J.R.’s argument lacks merit.

CONCLUSION

Accordingly, for the reasons above, we affirm the judgment of the trial court terminating J.R.’s parental rights and freeing E.R. for adoption.

AFFIRMED

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules Courts of Appeal, the initials of the minor and family members involved will be used to protect the child's identity. State Dept. of Soc. Services, ex rel. S.S., 07-165 (La.App. 5 Cir. 9/25/07), 968 So.2d 199, 200.

.This petition also sought to terminate the parental rights of R.W., E.R.'s alleged father. The trial court granted the petition with respect to R.W. and terminated his parental rights. As R.W. has not appealed however, we omit further discussion of these proceedings as they relate to R.W.

. J.R.’s "notice of appeal,” filed on March 26, 2013, was timely under La. Ch.C. art. 332, which allows a fifteen-day delay to take an appeal. The trial court granted the appeal on March 27, 2013.

. J.R.'s attorney represented her in these proceedings and did not object to the commencement of trial without her client present.

. DCFS introduced into evidence its Exhibit B, Dr. Breidenstine’s curriculum vitae.

. At the request of the DCFS attorney, the trial court took judicial notice of the underlying Child In Need of Care record in this case, docketed under ll-CC-64. The trial court also admitted State's Exhibit E, Dr. Rodriguez's progress notes.

. Adults can take years to improve their functioning but developing children do not have such time, as children’s lives are significantly disrupted while their parents are attempting to deal with their own problems. State in Interest of J.R., 11-351 (La.App. 5 Cir. 12/13/11), 84 So.3d 623, 631; State in the Interest of C.D., 558 So.2d 806 (La.App. 5 Cir. 1990).

. For example, Dr. Breidenstine concurred with the Infant Team’s belief that it is E.R.'s best interest to implement a permanent plan for him at that time.